861 P.2d 1182

Arthur J. MARTORI, Petitioner,

v.

ARIZONA STATE LAND DEPARTMENT; M.J. Hassell, Arizona State Land Commissioner; and Core North, Inc., an Arizona corporation, Respondents.

No. 1 CA–SA 93–0025.

Court of Appeals of Arizona, Division 1, Department B.

July 20, 1993.

Review Granted Nov. 4, 1993.

Meyer, Hendricks, Victor, Osborn & Maledon, P.A. by Paul J. Meyer, Andrew D.

Hurwitz and Mark Andrew Fuller, Phoenix, for petitioner.

Grant Woods, Atty. Gen. by Michael J. Phalen, Asst. Atty. Gen., Phoenix, for respondents Arizona State Land Dept. and M.J. Hassell, Arizona State Land Com'r.

Fennemore Craig, P.C. by Donald R. Gilbert, Timothy Berg, Robert B. Rice and by Scot Butler III, Phoenix, for respondent Core North, Inc.

## OPINION

JACOBSON, Presiding Judge.

■ This statutory special action[1] raises the issue whether a proposed sale of state trust lands that has the alleged practical effect of soliciting only one bidder is invalid.

Arthur J. Martori filed a petition for special action to request this court to review the order of the Arizona State Land Commissioner (Commissioner) denying petitioner's protest of the terms of a proposed auction for the sale of state trust land. We have jurisdiction pursuant to A.R.S. § 37–301(C).

## BACKGROUND

The Arizona State Land Department (Department) planned a development project involving approximately 2360 acres of state trust land in north Scottsdale known as the Core North Project (the "Project"). In order to obtain the greatest benefit for the trust from the disposition of this property, serious drainage problems that affected the area had to be solved. The plan envisioned that the area would provide residential lots and two golf courses. Based upon advice from an outside consultant, the Department determined that an 18 month "window of opportunity" presented itself in

1. A.R.S. § 37–301(C) provides that an order denying a protest of an order of the State Land Commissioner can be challenged only through a special action to an appellate court. We must accept jurisdiction of such an action. *See Arkules v. Board of Adjustment,* 161 Ariz. 598, 600, 780 P.2d 431, 433 (App.1989).

which the Department could dispose of the golf course and residential portions of the Project on favorable terms.

The Department attempted to resolve the drainage issues through negotiations with the City of Scottsdale, but the Department determined that such a resolution would not occur for several years. To solve these problems, the Department decided to dispose of the property in a manner that required others to construct the drainage infrastructure.

The Department first considered selling the property as a whole. This option was rejected for several reasons, one of which was that the Department had an application from Core North, Inc. to lease the golf course parcels, which would allow construction of a portion of the drainage infrastructure to begin more quickly than might otherwise occur.[2] Based upon these considerations, the Department decided to go forward with a two-step program to dispose of the property: (1) first it would auction long-term leases of the golf courses, and (2) it would sell the remaining property in fee. The fee sale would be subject to the golf leases; that is, the purchaser of the fee would step into the position of the state as lessor of the golf courses, but the lease terms did not give the lessor effective control of the golf courses. The bidders would be required to bid an amount equal to or greater than the appraised value of the property, and, in addition to the purchase price, the successful bidder would be required to pay a percentage of the profits realized by subsequent sales of the property.

The drainage problems that affected flood control also affected the value of the property. Under the plan, most of the property north of the Thompson Peak Parkway and west of Hayden Road ("Village 1") may be developed before any drainage improvements are required in Villages 2 and 3. Thus, the 436 acres in Village 1 are considerably more valuable than the remaining property in Villages 2 and 3. To avoid a potential buyer of the fee from "cherry picking," that is, selling off the more desirable Village 1 property and then defaulting on the remaining property, the Department required a substantial premium in order to obtain partial patents.[3] Also, in order to obtain partial patents the fee owner was required to pay into escrow the sum of $20,000 per acre, which was to be used to (1) reimburse up to $4,000,000 incurred by the golf lessee in building drainage improvements, and (2) pay the water development costs in connection with the golf courses. The Department's plan thus involves the golf lessee in helping to prevent the sale of Village 1 and the return of the less desirable Villages 2 and 3, and requires the fee owner to pay 99.9% of the purchase price in order to obtain partial patents in Village 1.

In structuring the lease/sale sequence, the Department considered whether separating the leases of the golf courses from the sale of the fee might make the purchase of the fee less attractive to persons other than the golf course lessees. The Department believed, however, that the method it adopted would allow any interested party to bid at either or both auctions. Moreover, such a plan addressed both the drainage problems and the "cherry picking" concerns. The Department provided notice to the public and the development community of the lease auction to be held in November 1992 and the sale auction to be held in early 1993.

On October 22, 1992, a public auction of the golf course leases was held. Respon-

---

**2.** Additional drainage channels along the northern and eastern boundaries of the Project would be necessary to solve the problems. The fee purchaser of the property was responsible for constructing the drainage infrastructure on the other portions of the property.

**3.** Under the purchase plan, the purchaser could obtain releases of certain portions of the property upon payment of certain sums. These releases in fee to the purchaser are referred to as partial patents.

dent Core North, Inc. was the only bidder, and it was awarded the leases. No protest was filed with the Department regarding this auction, and it subsequently became final.

Approximately two weeks later, the Department gave notice of the sale of the fee for the real property subject to the golf course leases. Petitioner filed a protest to the terms of the proposed auction. The Commissioner appointed a hearing officer to consider the protest, and a hearing was held in December 1992 and January 1993. In the protest, petitioner claimed that the structure of the sale was such that no bidder other than the lessee of the golf course property would be in a position to bid at the public auction. This is so, according to petitioner, because the fee purchaser is given no control over the design of the golf courses, including amenities such as clubhouses, restaurants, etc., the quality of the golf course, the priority of access to the golf course by residential lot owners, or the timing of the development of the course (other than the time limitations imposed by the leases themselves) that would directly affect residential construction. Because of these considerations, petitioner contends that the terms of the proposed auction chilled competitive bidding in violation of the public auction requirements of section 28 of the New Mexico–Arizona Enabling Act of 1910 and Arizona law. *See* Act of June 20, 1910, Pub.L. No. 219 (ch. 310), 36 Stat. 557 ("Enabling Act"); *see also* Ariz. Const. art. 20 (adopting Enabling Act).

The hearing officer, in a lengthy decision and order, recommended that the Commissioner deny the protest and hold the scheduled public auction sale. The Commissioner adopted the findings of fact and conclusions of law of the hearing officer, and determined that the public auction sale would proceed as scheduled. Petitioner then filed this special action pursuant to A.R.S. § 37–301(C).

## LEGAL DISCUSSION

█ Petitioner's special action focuses on what he perceives to have been an erroneous legal standard applied by the hearing officer in denying the protest to the public auction. In particular, petitioner contends that the hearing officer incorrectly determined that, if the sale terms included no illegal provision and there was no evidence that the Commissioner committed fraud or intentionally stifled or eliminated competitive bidding, the proposed sale was valid.

Petitioner argues that his evidence is uncontradicted that, because of the way the sale was structured, the only entity that would "rationally" have any interest in bidding would be the lessee of the golf courses. From this premise, petitioner argues that, when a proposed auction "is structured so that as a practical matter there can only be one bidder, there is no 'public auction' as required by the Enabling Act."

The responses of the Department and Core North to this argument are somewhat different. The Department argues that the correct legal standard for deciding whether the terms of a public auction sale "chill" the bidding is to determine if the sale contains any illegal provisions and then to determine whether the Commissioner subjectively intended to stifle or eliminate competitive bidding. Because petitioner admits neither of these factors is present in this sale, the Department argues that, as a matter of law, the proposed sale is valid. The Department further argues that petitioner's true complaint is with the terms of the golf course leases, against which no protest was filed.[4]

---

4. Petitioner agrees that a sale subject to a lease does not necessarily result in an invalid sale. However, he argues that, because the Department could unilaterally rescind this lease, the Department should have exercised this option in order to obtain more bidders at the fee sale. However, the rescission option was available only if the state did not sell the fee interest subject to the lessor's interest within 180 days. This provision was inserted because of concerns

On the other hand, Core North notes that, although neither of the factors identified by the Department exists here, the hearing officer made additional factual findings that the sale was not structured to eliminate bidding and that the sale was in the best interests of the trust. Core North argues that the real issue in this case is whether the Commissioner's structure of the sale was within the sound exercise of his business judgment, and as long as the trust receives the "actual value" of the property sold at the public auction and no provision of the sale is unlawful, petitioner cannot show that the structure of the proposed sale chilled the bidding.

■ Under the Enabling Act, the Arizona Constitution, and Arizona statutes, any disposition of state trust property must be by public auction, and the state may receive not less than the appraised value of the property. *See* Enabling Act § 28; Ariz. Const. art. 10, § 3; A.R.S. § 37–236(A). Disposals of public land that are designed to obtain only the appraised value without realizing the greatest return possible violate the Enabling Act. *See Fain Land & Cattle Co. v. Hassell*, 163 Ariz. 587, 790 P.2d 242 (1990) (property exchange that ensures only that the trust receives appraised value violates Enabling Act as adopted by Arizona Constitution); *see also Deer Valley Unified School Dist. No. 97 v. Superior Court*, 157 Ariz. 537, 760 P.2d 537 (1988) (eminent domain proceeding against school trust property violates Arizona Constitution); *Gladden Farms, Inc. v. State*, 129 Ariz. 516, 633 P.2d 325 (1981) (transfer at appraised value to another state agency violated Enabling Act and Arizona Constitution); *Farmers Invest. Co. v. Arizona State Land Dep't*, 136 Ariz. 369, 666 P.2d 469 (App.1982) (imposition of an unauthorized condition chilled the bidding in violation of Enabling Act and Arizona law). Other jurisdictions have also recognized additional limitations on public auc-

tions. *See State ex rel. Peevy v. Cate*, 236 Ark. 836, 371 S.W.2d 541 (1963) (sale of property subject to a lease that included two illegal terms chilled the bidding); *Pike v. State Bd. of Land Comm'rs*, 19 Idaho 268, 113 P. 447 (1911) (Land Board has discretion to determine when and what property to sell despite fact that size of the tract effectively limited auction to one bidder); *Schwartz v. Capital Sav. & Loan Co.*, 56 Ohio App.2d 83, 381 N.E.2d 957 (1978) (conduct that stifles competitive bidding at auction contrary to public policy). We therefore reject the Department's contention that the Commissioner's powers are limited only by the requirement that all terms of the sale must be legal and in good faith.

Assuming, without deciding, that having only one bidder at public auction results in a depression of the price received, obtaining the highest price for a parcel of property is not the only mandate given to the Commissioner. The constitutional and statutory requirement is that the sale must be to the "highest and best bidder" at a public auction. Enabling Act § 28; Ariz. Const. art. 10, § 3; A.R.S. § 37–236(A). This issue was addressed in *Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Products, Inc.*, 167 Ariz. 383, 807 P.2d 1119 (App.1991), where the Commissioner refused to renew a lease of state land, and, as a result, no revenues were immediately forthcoming. The disappointed lessee sued contending that the failure to reissue a lease eliminated lease revenue to the trust and, therefore, the Commissioner abused his discretion. In rejecting this argument the court noted:

> Lease revenue is not the sole factor which governs the department's decision. The legislature chose a broader, "best interest" standard that permits other considerations, such as the public benefits flowing from employing state land in uses of higher value than would the applicant for a lease.

that the requirements placed on the fee purchaser might not produce any bidders. The parties do not contend that the state could exercise this

option if a good faith effort was not made to effectuate the sale of the fee.

*Id.* at 392, 807 P.2d at 1128. After reviewing the evidence before the Department, including alternative uses for the land and the irresponsibility of the proposed lessee, the court concluded:

> We cannot say that the failure to generate immediate income by declining to renew the lease was an abuse of discretion under all of the circumstances. *This is precisely the type of decision which is best left to the expertise and discretion of the commissioner.*

*Id.* (emphasis added).

■ Likewise, in this case, although a public auction that has only one bidder has the potential to violate the public bidding laws of this state, there is a fine line between terms of sale that are truly in the best interest of the trust, although discouraging certain bidders, and terms that improperly limit the universe of potential bidders to one.

■ In our opinion, the evidence in this case supports the hearing officer's factual determination that this line had not been crossed. The hearing officer's findings of fact and conclusions of law, adopted by the Commissioner, provide as follows:

> The Commissioner acted appropriately, within governing laws and without abuse of his discretionary powers, in structuring the subject sale auction in such a manner that it would 1) guarantee receipt of a bid at or above the appraised value of the subject land, 2) protect the Trust assets against default and "cherry picking", and 3) protect adjacent Trust assets and enhance their value for future financial benefit to the Trust. The terms of the sale are authorized by statute either specifically or within the Commissioner's discretion as trustee of the State Land Trust. There was no illegal act committed and no intent or purpose by the Commissioner to favor one bidder over any others. Therefore, there could not be a "chilling" effect on the bidding process.

> ... This auction is designed to satisfy the best interests of the Trust and is legally structured to maximize the financial benefits flowing to the Trust from its assets.

Petitioner construes this ruling to be a misapplication of Arizona law because it imposes a standard under which the Commissioner could never "chill" the bidding as long as the Commissioner included no illegal provision in the sale documents, committed no illegal act, and had no subjective intent or purpose to favor one bidder. We do not construe the decision and order so narrowly. We find that the first portion of the paragraph makes specific findings that the Commissioner acted within the law and without abusing his discretion in the structure of the sale, and that these terms were specifically designed to address problems peculiar to this piece of property. Although petitioner might argue that the sequence of lease/fee sale is not the only way to address these problems, the discretion in handling sales of public property is vested in the Commissioner, not petitioner.

The dissent criticizes the majority's attempt to draw a "fine line" between permissible auctions that may limit bidders and impermissible auctions that have the same effect. This criticism is not without merit. However, the evidence in this case shows that, under the terms of the proposed fee sale, the appraised value of the property of $22,000,000 must be received. In addition, because of "participation payments," the trust will receive an additional sum of $813,500. Moreover, the drainage problems on the land are solved and the trust is protected against the possibility of a buyer ending up with the most desirable portion of the property and the less desirable property being returned to the Department. Under these circumstances, the "fine line" which the Commissioner must draw in the exercise of his discretion was, under the evidence here, fully justified.

Finally, we note that the plan for the bifurcated lease/sale of this parcel is so

interrelated that it can almost be viewed as a single transaction. Before any sale took place, prospective purchasers could assess the matter as a whole, and, realizing that it might not be feasible to acquire the residential property without also controlling the golf courses, decide whether they could undertake the entire project and, if so, what they should bid to acquire it. All prospective purchasers of sufficient financial strength to compete for the whole project were on an equal footing. Although there might have been fewer prospective purchasers with sufficient funds to handle the entire project than there were prospective purchasers who could afford to participate in one phase or the other, the plan adopted cannot be said to stifle competition. Having passed up the opportunity to treat the project as a whole, petitioner is not now entitled to restructure the sale transaction to make it more economically feasible from his standpoint.

■ Although the Commissioner and the courts must carefully scrutinize a sale that, in effect, severely limits potential bidders on state trust property, as long as the proposed sale terms are justified by the best interests of the state trust, do not include conditions that would exclude eligible bidders, are not intended to favor a particular bidder, and are not otherwise contrary to law, the Commissioner has the discretionary authority to determine the structure of a proposed sale. We find no violation of the public auction requirement of the Enabling Act and Arizona law in this case.

For the foregoing reasons, we deny the relief requested.[5]

KLEINSCHMIDT, J., concurs.

GRANT, Judge, dissenting.

I respectfully dissent. I would grant the relief requested by the petitioner by vacating the Commissioner's order and declaring Public Auction Sale No. 53–99869 invalid.

I agree with petitioner that the auction was structured so that only one bidder could bid, and therefore the auction violates The Enabling Act and the spirit of our supreme court's opinion in *Fain Land & Cattle Co. v. Hassell*, 163 Ariz. 587, 790 P.2d 242 (1990). The majority's "fine line between terms of sale that are truly in the best interest of the trust, although discouraging certain bidders, and terms that improperly limit the universe of potential bidders to one" is no line at all. *Fain*, holds that any disposition of trust land *"not in substantial conformity with the provisions of The Enabling Act* is 'null and void.'"* 163 Ariz. at 589, 790 P.2d at 244 (emphasis added). The "fine line" distinction of the majority does not comply with this strict requirement of "substantial conformity." *Fain* also held that: "Without sale at public auction, the trust is not guaranteed the additional profit that might result from *competitive* bidding." *Id.*, at 593, 790 P.2d at 248 (emphasis added) (citation omitted). There cannot be competitive bidding with only one bidder. *See* Enabling Act § 28; Ariz. Const. art. 10, § 3.

---

5. Petitioner has moved to supplement the record with evidence about what occurred at the auction held on February 4, 1993. Respondents have moved to supplement the record with official records of the Land Department's dealing with the facts surrounding the decision in *Ew-* ing v. State, 155 Ariz. 200, 745 P.2d 947 (1987), *appeal dismissed,* 486 U.S. 1002, 108 S.Ct. 1723, 100 L.Ed.2d 188 (1988). Both requests are denied, and the court has not considered these matters in disposing of this case.