860 P.2d 1341

**Richard V. CAMPANA, Petitioner,**

**v.**

**ARIZONA STATE LAND DEPARTMENT; M. Jean Hassell, Arizona State Land Commissioner, Respondents,**

**NORTHEAST PHOENIX PARTNERS, Real Party in Interest.**

**No. 1 CA–SA 93–0190.**

Court of Appeals of Arizona, Division 1, Department D.

Oct. 5, 1993.

Reconsideration Denied Nov. 3, 1993.

Richard V. Campana, in pro. per.

Grant Woods, Atty. Gen. by Patricia J. Boland, Asst. Atty. Gen., Phoenix, for respondents Arizona State Land Dept. and M. Jean Hassell.

Gammage & Burnham by Grady Gammage, Jr., Shawn E. Tobin and Stephen W. Anderson, Phoenix, for real party in interest.

## OPINION

GERBER, Judge.

## FACTS AND PROCEDURAL HISTORY

The Commissioner (Commissioner) of the Arizona State Land Department (Department) scheduled two public auctions for land in Northeast Phoenix. The land in question, held in trust pursuant to the Enabling Act, was part of an undeveloped residential community called Desert Ridge, which was planned in cooperation with the City of Phoenix pursuant to the Urban Lands Act, Ariz.Rev.Stat.Ann. ("A.R.S.") section 37–331 *et seq.* To realize maximum value of the land, the Department devised a mechanism for the installation of infrastructure (water, sewer, garbage, streets and bike paths) via a land sale, because neither the Department nor the City of Phoenix had the financial resources to install the infrastructure.

To accomplish its goal, the Department scheduled two auctions. One auction was for three leases for a total of 563 acres: (1) 332 acres of commercial core land, (2) 52 acres of resort land and (3) 179 acres of golf course land. The second auction was for the sale of 781 acres of residential land and 58 acres of public roadway/utilities, totaling 839 acres. The Department structured the auctions so that each could be bid on separately.

The successful bidder for the leases of the 563 acres would become the master developer in charge of the development of Desert Ridge. The Department envisioned the commercial lease bidder as master developer because this bidder would have a long term commitment to the community as the holder of the 99-year lease. As a condition to developing the land, the successful bidder for the sale of the residential land was required to post a bond for the installation of the infrastructure. Article 27 of the lease contains a paragraph regarding rental reduction and a separate paragraph regarding severability of any invalid provisions.

Campana, the petitioner here, filed a protest to the scheduled auctions. He requested that they be canceled, that the lands be re-appraised and that the auctions be reconfigured so that all prospective bidders would be on equal footing. After a hearing at the Department, the hearing officer determined that Campana's protest was meritless. The Department held the auctions as scheduled. Respondent Northeast Phoenix Partners was the sole bidder at both auctions. Campana did not bid.

After the auctions, Campana filed this special action pursuant to A.R.S. section 37–301(C), which makes our appellate jurisdiction mandatory. He raises five issues which we discuss in sequence.

## DISCUSSION

### I. WAS BIDDING AT THE AUCTION CHILLED?

#### A. THE ENABLING ACT

In 1910, the Arizona–New Mexico Enabling Act authorized people of the two territories to form state governments. The

Enabling Act confirmed prior land grants to the Arizona Territory and granted more land to the new state. In 1911, the Arizona electorate accepted land grants by ratifying article 10, section 1 of the Arizona Constitution. Provisions of the Enabling Act then became part of Arizona law. *Kadish v. Arizona State Land Dept.*, 155 Ariz. 484, 486, 747 P.2d 1183, 1185 (1987).

■ The federal government granted four sections of land in each township to the State of Arizona (10 million acres total), which could only be used for support of the common schools of the state (school trust lands) and for internal state improvements. *Id.* Section 28 of the Enabling Act prohibits sale, conveyance or encumbrance of any part of school trust lands except to the "highest and best bidder" at a public auction after public notice. The State can dispose of this school trust land only if it obtains the true value as determined by an appraisal. *Id.* at 487, 747 P.2d at 1186.

## B. THE BIDDING ISSUE

Campana argues that the bidding was chilled by the relationship of the commercial leases to the land sale. He claims that as a general rule, "... any act of the auctioneer, or of the party selling, or of third parties as purchasers, which prevents a fair, free, and open sale, or which diminishes competition and stifles or chills the sale, is contrary to public policy and vitiates the sale." 7A C.J.S. *Auctions and Auctioneers* § 14 (1980). He claims that the totality of the auction circumstances unfairly discriminated between a potential core lessee bidder and a residential bidder, because the core lessee as master developer is preferred over the residential developer. He claims that this difference stifled competition and chilled the bidding process.

The Department and Northeast Phoenix Partners (collectively Northeast Phoenix Partners) argue that there is no evidence the bidding process was so chilled. We agree.

■ Pursuant to *Berry v. Arizona State Land Dept.*, 133 Ariz. 325, 651 P.2d 853 (1982), the Commissioner is obligated to manage trust lands for the benefit of the trust and its beneficiaries. *Id.* at 327, 651 P.2d at 855. He has the duty to maximize revenue to the trust. *Gladden Farms, Inc. v. State*, 129 Ariz. 516, 520, 633 P.2d 325, 329 (1981). However, immediate revenue is not the sole consideration in determining the best interests of the trust. *Havasu Heights v. Desert Valley Wood*, 167 Ariz. 383, 392, 807 P.2d 1119, 1128 (App. 1990), *review denied*, April 23, 1991. The Commissioner has great discretion concerning the disposition of trust lands and has authority to devise detailed plans for the sale, lease, and use of state land. These decisions will not be overturned absent illegal action, an abuse of discretion, or an unfair bidding. *Id.* at 391–92, 807 P.2d at 1127–28.

■ In a recent decision of this court, *Martori v. Arizona State Land Dept.*, 176 Ariz. 420, 861 P.2d 1182 (App.1993), we found a distinction between terms of sale that are in the best interest of the trust, although discouraging certain bidders, and terms that improperly limit the universe of potential bidders to one. *Id.* at 425, 861 P.2d at 1187. The *Martori* standard for evaluating whether bidding was chilled is as follows:

> [a]s long as the proposed sale terms are justified by the best interests of the state trust, do not include conditions that would exclude eligible bidders, are not intended to favor a particular bidder, and are not otherwise contrary to law, the Commissioner has discretionary authority to determine the structure of a proposed sale.

*Id.* at 426, 861 P.2d at 1188. There is no evidence in the record of any illegal deals or preferential negotiations of any sort occurring prior to the auctions. Nor is there any evidence showing that one bidder was encouraged or favored over other potential bidders. There is no evidence that the Department showed any preference to the Northeast Phoenix Partners before or dur-

ing the auction process. The fact that only one entity bid at the auction is irrelevant and explainable by a host of reasons from lack of interest to lack of money.

We conclude that the record supports the hearing officer's ruling that the bidding was not chilled.

## II. WAS THERE AN APPRAISAL OF THE LAND?

Campana argues that pursuant to A.R.S. sections 37–236(A) and –237, the Department must sell trust lands to the "highest and best bidder" at public auctions after giving notice to potential bidders. He argues that section 28 of the Enabling Act requires that all lands "shall be appraised at their true value" before sale. He claims that there was no current appraisal performed. He states that a 1990 appraisal recommended that the land sell for $30,000 per acre. In 1992, Mark Wirth, an appraiser, recommended that the land sell for $11,000 per acre cash and $13,199 per acre on terms. Campana contends that the Commissioner merely concurred with Wirth's appraisal without conducting the required separate appraisal.

Northeast Phoenix Partners argues that pursuant to A.R.S. section 37–132(A)(5), the Commissioner becomes an appraiser under the language stating that "[t]he Commissioner shall ... [c]lassify and appraise all state lands ... for the purpose of sale, [or] lease...."

■ We agree with Northeast Phoenix Partners. In setting the value of land, the Commissioner in effect makes an appraisal even if he relies on prior data. *Bettwy v. Black Canyon Greyhound Park, Inc.,* 119 Ariz. 227, 580 P.2d 365 (1978), *review denied,* June 13, 1978. The Commissioner has both the power and the duty to appraise. His appraisal here set values midway between the Wirth values, which appears a reasonable rather than random determination. The fact that Campana disagrees with the appraised values does not

suggest that the required appraisal was ignored. We do not find any abuse of discretion.

## III. WAS THE APPRAISAL PERFORMED WITHIN 180 DAYS?

A.R.S. section 37–102(G) requires that the Department issue an appraisal within 180 days prior to a sale or lease. Campana argues that Wirth used 1991 comparables that invalidated the appraisal because the 1991 data predated the auction by considerably more than 180 days. He claims that the Commissioner's failure to do a further independent appraisal before setting the land values violated A.R.S. section 37–102(G).

Northeast Phoenix Partners argues, as above, that A.R.S. section 37–132(A)(5) makes the Commissioner an appraiser.

■ We agree with Northeast Phoenix Partners for the reason stated immediately above. When the Commissioner set the pre-auction value, he did an appraisal by that very act. The record reveals that the Commissioner set the value within 180 days of the auctions by fixing the bidding price between $11,000 and $13,199. The statute was not violated.

## IV. DID LEAPFROG DEVELOPMENT RESULT?

Pursuant to A.R.S. section 37–132(A)(4), the Commissioner must prevent leapfrog development and urban sprawl. Campana now claims that the Department's auctions generated this prohibited result.

A.R.S. section 37–101(16) defines leapfrog development as "... the development of lands in a manner requiring the extension of public facilities and services from their existing terminal point through intervening undeveloped areas that are scheduled for development at a later time...." A.R.S. section 37–101(23) defines urban sprawl as "... the development of lands in a manner requiring the extension of public

facilities and services on the periphery of an existing urbanized area where such extension is not provided for in the existing plans of the local governing body...."

Campana claims that sewers will have to be brought in to the leased land from three miles away. According to Campana, the City of Phoenix customarily pays to bring infrastructure to residential communities, but will not do so for Desert Ridge. To Campana, the City's position on the infrastructure shows the kind of leapfrogging and sprawling development prohibited by A.R.S. § 37-132(A). Northeast Phoenix Partners responds, in part, that Gordon Taylor, project planner for the Department, testified at the hearing that neither the City of Phoenix nor the Department views Desert Ridge as a leapfrog development.

■ Our task on review is to see if there is any evidence supporting the hearing officer's conclusion. Taylor's testimony supports the hearing officer's conclusion that neither leapfrog development nor urban sprawl occurred. That others may disagree is irrelevant; the point is that Taylor's testimony supports the ruling. Because of this testimony, as well as the photographic evidence showing linkage with existing development, there is sufficient evidence to support the hearing officer's decision. There was accordingly no abuse of discretion.

## V. DOES THE RENTAL ADJUSTMENT CLAUSE VIOLATE THE ENABLING ACT?

Campana argues that the rental adjustment clause cannot stand. He claims that such a clause, which permits discretionary rent reduction, constitutes bad public policy because it allows the Department to make deals overly generous to the lessee and detrimental to the trust.

Northeast Phoenix Partners responds that there have been many defaulting lessees in the recent past due to falling land values. The rental adjustment clause was put in the lease, in its view, to ensure that the lessee would always be able to pay its rent, so as not to default and penalize the trust if land values declined. Northeast Phoenix Partners argues that the adjustment clause does not assure a right of reduced rent but merely allows a lessee to petition the Department's Board of Appeals for a rental reduction if property values fall.

■ We agree with Campana in part. Under A.R.S. section 37-281.02, rental adjustment formulas must be included in the terms of leases. A.R.S. section 37-281.-02(F) states that "the rental adjustment formula for ... lease[s] shall be established by the department prior to the call for bids." Although this procedure was followed, the unspecific rental reduction clause renders the selling and leasing value indefinite because of the perpetual possibility of open-end rent reduction. The clause at issue contains no mathematical formula or other factors such as the consumer price index to govern any rental reduction. The language in Article 27 regarding rental reduction merely states:

Lessor and Lessee may agree, with the approval of the Board [of Appeals], to amend the rent provisions in Article 5 to reduce rent due and/or modify the method of adjusting the rent if at any time after the first three ... Lease Years, Lessor and Lessee mutually agree that the real estate market affecting the Parcel had deteriorated since the execution of this Lease rendering the Lease uneconomic.

Under A.R.S. section 37-281.02, the rental adjustment formula must be specified in the lease prior to the bidding process so that at the time of the auction, the lease price is a known and definite figure. Article 27 of the lease sets no such fixed formula for reducing rent. Instead it allows for unstructured future negotiations whenever the lessee claims that real estate conditions render the lease "uneconomic." Such an indeterminate rental reduction

clause violates A.R.S. section 37–281.02, which requires that the Department sell or lease lands to the "highest" bidder. The "highest" bidder cannot truly be determined if the rent could be arbitrarily reduced at a later date through further negotiations. Under such a lease, the true value of the land also becomes dependent on nebulous factors such as the negotiating skills of the lessees and the degree of receptivity of the Land Department.

 However, the entire lease is not void due to this offending provision. Paragraph 4 of Article 27 of the lease states that "[i]f any provision of this Lease or any application thereof shall be invalid or unenforceable, the remainder of this Lease and any other applications of such provision shall not be affected hereby." This language suggests the severability of the offending provision. The drafters of the lease obviously intended for the rental reduction clause to be severable from the rest of the lease so that the remainder could stand alone. *See Stika v. Albion*, 150 Ariz. 521, 724 P.2d 607 (App.1986). A statute or provision is severable if

> the valid parts are independently effective and enforceable as law and if the valid and invalid portions are not so intimately connected as to raise the presumption that the legislature would not have enacted the one without the other and if the invalid portion was not the inducement for the passage of the entire act....

*State ex rel. Berger v. Superior Court*, 106 Ariz. 365, 369, 476 P.2d 666, 670 (1970) (quoting *McCune v. City of Phoenix*, 83 Ariz. 98, 106, 317 P.2d 537, 542 (1957).

Nothing in the record suggests that the rental adjustment clause inspired the contents of the lease. To determine whether the remaining portions of the lease can stand, we apply a two-prong test: (1) do fundamental elements of the lease exist so that the lease stands independent of the rental reduction clause, and (2) is severing the rental reduction clause a negative factor that would have chilled bidding? We examine whether the lease is valid without the rental reduction clause by asking whether the fundamental elements of the lease remain after severance. After severance of the rental reduction clause, the fundamental terms of the lease still remain: parties, names, addresses, duties, compensation, and timing are specified. The lease is therefore valid without the offending clause.

Nor does severance of the rental reduction clause affect the attractiveness of the lease for bidding purposes. Establishing one rental possibility does not favor one bidder over another, because all would be bidding on the lease with fixed rather than flexible rent. Indeed, the lease with the original rent reduction clause could be seen as especially attractive rather than as "chilling." We find no reason why this severance of the rental reduction clause would chill the bidding process which has already occurred.

### CONCLUSION

We affirm the hearing officer's decisions except as to the rental adjustment clause which is hereby severed from the lease. The remainder of the lease remains in effect.

WEISBERG, P.J., and JACOBSON, J., concur.