193 P.3d 776

**NORTHEAST PHOENIX HOLDINGS, LLC, Petitioner,**

v.

**Mark WINKLEMAN, in his official capacity as State Land Commissioner, Respondent,**

and

**Jaren Associates # 4, Intervenor.**

No. 1 CA–SA 08–0011.

Court of Appeals of Arizona, Division 1, Department E.

April 22, 2008.

Review Denied Sept. 23, 2008.

Gammage & Burnham, PLLC By Grady Gammage, Jr. and Cameron C. Artigue, Phoenix, Attorneys for Petitioner.

Terry Goddard, Arizona Attorney General by Theresa M. Craig, Assistant Attorney General, Phoenix, Attorneys for Respondent.

Osborn Maledon PA by Thomas L. Hudson and Jean–Jacques Cabou, Phoenix, Attorneys for Intervenor.

## OPINION

BROWN, Judge.

¶1 Northeast Phoenix Holdings, LLC ("Petitioner") filed for special action review of the denial of its protest to the proposed auction of school trust lands by the State Land Commissioner ("Commissioner"). For the following reasons, we accept jurisdiction but deny relief.[1]

## BACKGROUND

¶2 This special action involves the proposed disposition of various rights-of-way ("ROWs") associated with a 112–acre parcel ("Parcel 3A") of state trust land. The ROWs are perpetual easements for various public roads, underground utilities, and drainage. Parcel 3A is part of a larger proposed master-planned development located on the border of north Phoenix and Scottsdale, known as Paradise Ridge, on land currently held in trust by the State of Arizona. The Commissioner and the Arizona State Land Department ("Department") are responsible for the management and revenue production of the trust land on behalf of the trust beneficiaries. See Ariz.Rev.Stat. ("A.R.S.") §§ 37–102, –132 (Supp.2007).

¶3 In January 2007, Jaren Associates # 4 ("Jaren") applied to the Department for a ninety-nine year commercial lease of Parcel 3A, an undeveloped lot containing no existing improvements, for the purpose of developing a regional shopping center.[2] Because Jaren's lease request exceeded ten years, a public auction was required. See A.R.S. § 37–281.02(A) (2003).

¶4 In preparation for the public auction, the Department contracted for an independent appraisal of Parcel 3A.[3] The appraisal instructions noted that the successful bidder would "incur an obligation to fund $59,144,823 of the required offsite infrastructure costs."[4] According to the independent appraisal, prepared by Sean Kelly, the assessed value of Parcel 3A was $29,280,000 to $32,940,000. The Department's Appraisal Section Manager, Stanley Toal, recommended that the Department accept the appraisal report as written. In August 2007, a commercial recommendations sheet was completed and signed on behalf of the Commissioner.[5] The commercial recommendations sheet included the acreage for the ninety-nine year lease of Parcel 3A and the 128 acres of ROWs and indicated an appraised value/minimum bid of $32,000,000. On September 13, 2007, the Department's Board of Appeals ("Board") approved the commercial recommendations sheet. An auction was set for October 29, 2007, and notice was published as required by law. Petitioner filed an auction protest, asserting that the proposed infrastructure agreement was incomplete because it was only in draft form. Thereafter, the Commissioner cancelled the auction and denied the protest as moot.

¶5 After making minor revisions to the infrastructure agreement, the Commissioner issued a second commercial recommendations sheet that superseded the first sheet. The revised document provided in pertinent part as follows:

> Sean M. Kelly, MAI State of Arizona Certified General Real Estate Appraiser, provided an Opinion of Market Value RANGE of the Lease Property, $29,280,000.00 to $32,940,000.00. *The State Land Commissioner has established the Appraised Value/minimum bid for the Lease and ROW's at $32,000,000.* Rent over the 99 year

---

1. Pursuant to Arizona Rules of Civil Appellate Procedure 28(g), we addressed the issue of whether Petitioner waived its right to challenge the proposed auction by separate memorandum decision filed herewith.

2. Jaren's involvement with Parcel 3A began in 1985. Because of its prior involvement, Jaren obtained a "preferred right" to match the highest and best bid at a public auction of Parcel 3A. See A.R.S. § 37–335(C) (2003).

3. Section 37–335(D) requires that the Department obtain at least one independent appraisal

for commercial leases offered at public auction if a former lessee has a vested preferred right.

4. By the time the auction was advertised, this amount was estimated to be $67,000,000.

5. The parties use the term "commercial recommendations sheet" to refer to a document entitled "Real Estate Division Commercial Leasing Section." We refer to the document in the same manner.

term yields a minimum of approximately 8.24% on ALV of $32,000,000. Successful bidder required to sign an Escrow & Infrastructure Agreement and deposit twenty million dollars by way of cashier's checks and/or letters of credit into an escrow account, which requires Lessee to construct significant infrastructure.

(Emphasis added.)

¶ 6 On November 8, 2007, the Board approved the second commercial recommendations sheet. The Department then set a new auction date of January 23, 2008. The auction notice stated that Parcel 3A had been appraised at $32,000,000 and that "the value of the Rights of Way have been assigned to this Parcel." The notice further provided that "[t]he successful bidder and/or assigns shall be responsible for the design, engineering, construction and installation of the Minimum Infrastructure (water and wastewater improvements estimated to cost $10,000,000.00) and the Maximum Infrastructure (streets, bridges, and drainage improvements estimated to cost $57,000,000.00) on, under, or within the Rights of Way . . . ."

¶ 7 On December 10, 2007, Petitioner filed its second auction protest, asserting that the Department had failed to conduct an appraisal of the 128 acres of ROWs or otherwise properly value the ROWs. Alternatively, Petitioner contended that the Department failed to obtain an independent appraisal of the ROWs and improperly attempted to assign a "zero-value" to the ROWs. On January 3, 2008, Petitioner requested that the Department conduct a hearing on its protest in accordance with A.R.S. § 37–301 (2003). On January 16, 2008, the Commissioner rejected Petitioner's request for a hearing and denied the auction protest. In his order rejecting the protest, the Commissioner determined he had properly appraised the ROWs and exercised his discretion by incorporating them into the values of the lease.

¶ 8 Petitioner then filed a petition for special action in this court challenging the Commissioner's decision. Petitioner also requested a stay of the January 23, 2008 auction.

We denied that request without prejudice when the Commissioner's counsel informed us the Commissioner had postponed the auction. Based on its claimed preference right, Jaren filed a motion to intervene and we granted the request.

### DISCUSSION

¶ 9 We must accept jurisdiction of this special action because Petitioner has sought relief pursuant to A.R.S. § 37–301(C). *See Foster v. Anable,* 199 Ariz. 489, 491, ¶ 3, 19 P.3d 630, 632 (App.2001).

### I. Appraisal of Rights–of–Way

■ ¶ 10 Petitioner argues that the Commissioner has exceeded his authority by proposing to auction the 128 acres of ROWs because no appraisal had been obtained on those ROWs pursuant to the Enabling Act and the Arizona Constitution. Petitioner maintains that the only appraisal conducted by the Department was Mr. Kelly's independent appraisal, which pertained only to Parcel 3A.

¶ 11 In 1910, the United States Congress passed the Arizona–New Mexico Enabling Act ("Enabling Act"), which in part allowed the residents of the Arizona territory to form a state government. Act of June 20, 1910, Pub.L. No. 219 (ch. 310), 36 Stat. 557; *see also Fain Land & Cattle Co. v. Hassell,* 163 Ariz. 587, 588, 790 P.2d 242, 243 (1990). Part of the Enabling Act granted certain federal land to Arizona at the time of Arizona's admission to the United States for the purpose of supporting Arizona's public schools.[6] *Fain Land & Cattle Co.,* 163 Ariz. at 588–89, 790 P.2d at 243–44. Additionally, Congress required that Arizona hold the granted land in trust and placed restrictions on the disposition of the land so the trust assets would not be "improvidently managed." *Id.* at 589, 790 P.2d at 244.

¶ 12 Section 28 of the Enabling Act provides in pertinent part as follows: "*All lands, leaseholds,* timber and other products of land, before being offered, *shall be appraised*

---

6. The United States granted Arizona approximately ten million acres of land, consisting of four sections of land in each township. *See*

*Kadish v. Ariz. State Land Dep't,* 155 Ariz. 484, 486, 747 P.2d 1183, 1185 (1987).

*at their true value,* and no sale or other disposal thereof shall be made for a consideration less than the value so ascertained ...." (Emphasis added.) If the sale or lease is not made in substantial conformity with the provisions of the Enabling Act, the sale or lease is null and void. *Id.* The limitations of Section 28 were explicitly incorporated into Article 10, Section 4 of the Arizona Constitution, which contains identical language. Thus, the Enabling Act became part of the law of Arizona when the people of Arizona ratified the proposed state constitution. *Fain Land & Cattle Co.,* 163 Ariz. at 589, 790 P.2d at 244.

¶ 13 When Congress passed the Enabling Act, it intended to severely circumscribe the power of state government to deal with the assets of the trust, and "all doubts must be resolved in favor of protecting and preserving trust purposes." *Kadish,* 155 Ariz. at 487, 495, 747 P.2d at 1186, 1194 (citing *United States v. New Mexico,* 536 F.2d 1324, 1326–27 (10th Cir.1976)). The restrictions of the Enabling Act were intended to prevent private sales at unreasonably low prices and to ensure that the trust receives appropriate compensation for trust lands. *Lassen v. Arizona ex rel. Ariz. Highway Dep't,* 385 U.S. 458, 464, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967).

¶ 14 The Enabling Act does not address, however, the specifics of the appraisal; it simply requires that the lands and leaseholds be appraised at their true value. *Princess Plaza Partners v. State,* 187 Ariz. 214, 220, 928 P.2d 638, 644 (App.1995). Furthermore, none of the cases cited by Petitioner suggest that the Enabling Act requires that any particular appraisal method be used by the Commissioner when appraising ROWs. Rather, the specifics regarding administration of the Enabling Act are left to statute.[7] *Bettwy v. Black Canyon Greyhound Park, Inc.,* 119 Ariz. 227, 229, 580 P.2d 365, 367 (App.1978), superseded by statute, 1981 Ariz. Sess. Laws, ch. 1, § 12, *as recognized in Rail N Ranch Corp. v. Hassell,* 177 Ariz. 487, 492 n. 2, 868 P.2d 1070, 1075 n. 2 (App.1994).

¶ 15 One of the duties of the Commissioner is to "[c]lassify and appraise all state lands, together with the improvements on state lands, for the purpose of sale, lease or grant of rights-of-way." A.R.S. § 37–132(A)(5). "The Commissioner has both the power and the duty to appraise." *Campana v. Ariz. State Land Dep't,* 176 Ariz. 288, 292, 860 P.2d 1341, 1345 (App.1993). In addition, A.R.S. § 37–335(N) provides:

> Within the scope of an approved development or secondary plan, the *commissioner may assess the value of rights-of-way* or parcels to be used for parks, schools, public facilities, open space or other public purposes, *and assign those values to parcels that will be sold or leased* for residential, commercial or industrial purposes as payment for the purchase or lease price that otherwise would be required for such rights-of-way, or parcels to be used for parks, schools, public facilities, open space or other public purposes. The total revenues derived from all parcels within the development plan shall not be less than the aggregate appraised value of all the parcels.

(Emphasis added.)

¶ 16 In *Bettwy,* this court disagreed with the Department's contention that the Commissioner had not made the required appraisal. 119 Ariz. at 229, 580 P.2d at 367. An appraiser employed by the Department opined that the subject land had a value of $5000 per acre. *Id.* at 228, 580 P.2d at 366. The Commissioner then signed the following statement: "I appraise the land at $5,000.00 per acre...." *Id.* at 228–29, 580 P.2d at 366–67. We concluded that the Commissioner had made the required appraisal. *Id.* at 229, 580 P.2d at 367.

¶ 17 In *Campana,* the bid protester argued that no current appraisal had been performed. 176 Ariz. at 292, 860 P.2d at 1345. This court concluded that "[w]hen the Commissioner set the pre-auction value, he did an

7. Petitioner cites *Arizona State Land Department v. State ex rel. Herman,* 113 Ariz. 125, 128–29, 547 P.2d 479, 482–83 (1976) for a discussion of how state lands should be appraised. We do not find that case persuasive because the land at

issue there had been condemned and, therefore, the eminent domain statutes governed the method of determining the value of the property taken. *See id.* at 127–28, 547 P.2d at 481–82.

appraisal by that very act." *Id.* The protester contended that the Commissioner had "merely concurred" with a prior independent appraisal without conducting the required separate appraisal. *Id.* We determined that when the Commissioner sets the value of land, in effect, he is making an appraisal, even if he relies on prior data. *Id.* We found the process to be a "reasonable rather than random determination." *Id.* We also noted that simply because the petitioner disagreed with the appraised value, such disagreement did not suggest that the required appraisal was ignored. *Id.*

¶ 18 Here, the Commissioner appraised the ROWs by assigning a value to them, as indicated in the commercial recommendations sheet. Mr. Kelly's appraisal listed a range of value from $29,280,000 to $32,940,000. The Commissioner subsequently "established the Appraised Value/Minimum bid for the Lease and ROW's at $32,000,000." By establishing the appraised value of $32,000,000, the Commissioner selected a figure within Mr. Kelly's appraised value range to cover both the parcel to be leased and the ROWs. The Commissioner also signed a "Procedures for Rights of Way" form for each of the listed ROWs, recommending that the value of each ROW be assigned to Parcel 3A as allowed by statute. *See* A.R.S. § 37–335(N). For each ROW, the Commissioner "concluded that the proposed disposition of the right(s) of way with the disposition parcel will not reduce the aggregate value of the urban planned area." Thus, we conclude that the ROWs were appraised by the Commissioner in substantial compliance with the requirements of the Enabling Act, the Arizona Constitution, and state statutes.[8]

## II. Appraisal For True Value

■ ¶ 19 Petitioner argues, relying upon *Lassen*, 385 U.S. 458, 87 S.Ct. 584, that the Commissioner did not appraise the ROWs at their "true value," as required by the Enabling Act. In *Lassen*, the United States Supreme Court determined that the Arizona Highway Department was required to pay the full appraised value for ROWs located on state trust lands. 385 U.S. at 469, 87 S.Ct. 584. Relying on the purposes of the Enabling Act, the court rejected the State's argument that the trust would benefit because the construction of highways would enhance the value of the remaining trust lands. *Id.* at 465, 468, 87 S.Ct. 584.

¶ 20 The situation presented to us here, however, involves a different scenario. The Department is not attempting, as it was in *Lassen*, to transfer ROWs based upon a mere presumption that adjacent trust lands will be enhanced in value at some point in the future. Rather, the Department has imposed a requirement that the successful bidder spend approximately $67,000,000 to construct infrastructure improvements to the ROWs and Parcel 3A as a condition of the lease. Recognizing the significant burdens of these infrastructure costs, along with the corresponding benefit to the trust, the Commissioner evaluated the independent appraisal and determined that Parcel 3A and the ROWs, considered together, should be valued at $32,000,000. In *Lassen*, no appraisal of any kind had been conducted for the ROWs that the Department attempted to convey to the highway department. *See id.* at 459–60, 87 S.Ct. 584. The benefit to the trust was based solely on the presumption that the state trust lands not conveyed as ROWs would have a future increase in value. *Id.* at 465, 87 S.Ct. 584. Further, the decision in *Lassen* does not suggest there was any type of agreement as to the type and timing of infrastructure improvements. Finally, *Lassen* did not involve a master-planned development, and therefore the Department could not rely on the Commissioner's authority to assign values from the ROWs to the remaining lands pursuant to A.R.S. § 37–335(N).

¶ 21 Petitioner also contends the appraisal of the ROWs at "zero dollars per acre" violates Article 10, Section 5 of the Arizona Constitution, which provides that "[n]o [state trust] lands shall be sold for less than three

---

8. The Commissioner was not required to obtain an independent appraisal for the ROWs. Section 37–335(D) does not impose such a requirement and Petitioner does not cite any other authority mandating an independent appraisal for ROWs.

dollars per acre ...." [9] Petitioner bases this assertion in part on the Commissioner's order rejecting Petitioner's protest:

4. Because the costs of infrastructure and rights of way represent burdens on land to be developed, appraisal analysis and market information indicate that land is commonly value "net" of rights of way. It is common for the Department to require dedications of rights of way in connection with the sale or lease of state trust lands and, therefore, in appraising state land, the additional value of lands subject to rights of way coupled with a requirement to dedicate such lands results in the addition and then subtraction of the rights of way value in valuation. *The result is that it is common for lands subject to such rights of way to have a net value of zero.*

(Emphasis added.)

¶ 22 This conclusion is based on a 2005 internal Department memorandum from Toal to the Commissioner. In the document, Toal discussed whether the then "standard practice" of appraising ROWs was necessary. According to the memo,

The State Land Department's standard practice of disposing of rights of way is to have both the primary property to be auctioned (the Disposition Tract) and all required rights of way appraised in order that the contributory value of the rights of way be recognized in the auction process. This standard practice involves determining the market value of the property on a net usable basis and then determining the value of the rights of way and subtracting that from the market value. The practice results in a methodology that recognizes the contribution of rights of way to the value of master-planned lands.

Based on this analysis, Toal recommended:

The standard practice is not reflective of the practice typical of the broader market. The proposed methodology, whereby the value of the rights of way are recognized

implicitly as contributing value to the Disposition Tracts as each component of the project as it is developed, is more in line with the practice of the market. Overall, as long as the rights of way are well-planned, such that they benefit the larger project, the "total revenue derived from all parcels within the development plan shall not be less than the aggregate appraised value of all parcels."

¶ 23 Petitioner would have us consider the value of the ROWs in isolation; however, we decline to do so as both Parcel 3A and the ROWs are clearly tied together for purposes of implementing the master-planned development, as reflected in the auction notice and related documents. Under the Enabling Act, the land must be appraised at its "true value." In order to determine the "true value" of Parcel 3A and the ROWs, it seems reasonable to us that the significant infrastructure costs, approximately $67,000,000, required to be incurred by the successful bidder, can be weighed by the Commissioner in establishing a value for the leased property. Further, pursuant to A.R.S. § 37–335(N), the Commissioner has been authorized to assess the value of the ROWs and to assign those values to the leased property. Therefore, we do not read the Commissioner's statement to say that the ROWs have a "true value" of zero. Rather, his statement, as well as the Toal memo, provides the analytical background for establishing a "net value" of $32,000,000 for both Parcel 3A and the ROWs.[10]

¶ 24 Additionally, Petitioner does not suggest that the methodology employed here by the Commissioner in establishing a value for the leased parcel/ROWs will cause any harm to the trust. *See Kadish,* 155 Ariz. at 495, 747 P.2d at 1194 ("[T]he Enabling act is intended to protect the school trust land from dissipation by the state government."). Nor did the Petitioner offer any evidence to the Commissioner that the actual value of the ROWs, considered together with the infrastructure obligation imposed on the success-

9. This requirement was removed from the Enabling Act in 1936. *See Lassen,* 385 U.S. at 467 n. 13, 87 S.Ct. 584.

10. As such, there is no violation here of Article 10, Section 5, of the Arizona Constitution be-

cause the average price per acre of all the land included in the proposed auction greatly exceeds the requirement that no land be sold for less than three dollars per acre.

ful bidder, is any greater than the combined appraised value established by the Commissioner. *See Fain Land & Cattle Co.*, 163 Ariz. at 595, 790 P.2d at 250 ("The purpose of the Enabling Act restrictions on the disposal of trust land is to ensure that the trust receives the most benefit possible from the trust lands."). Therefore, we find the Commissioner's appraisal to be consistent with the requirements of the Enabling Act and the Arizona Constitution.

### III. Denial of Hearing Protest

¶ 25 Petitioner argues that the Commissioner abused his discretion when he denied Petitioner's request for a hearing on its protest, asserting that because the Commissioner included findings of fact in the order rejecting the protest, a hearing should have been granted. We disagree.

¶ 26 Petitioner cites *Stoffel v. Arizona Department of Economic Security*, 162 Ariz. 449, 784 P.2d 275 (App.1990), for the proposition that "[w]hen finding the facts in a quasi-judicial capacity, the Commissioner must make his decision based on evidence adduced at a hearing." In *Stoffel*, the court concluded that the manner in which the appeals board for the Department of Economic Security reviewed the evidence presented violated the claimant's due process rights. *Id.* at 452, 784 P.2d at 278.

¶ 27 *Stoffel* is not applicable here. Section 37–301(B) provides that at the Commissioner's discretion, he "*may* order a hearing on any protest." (Emphasis added.) Nothing in the statute requires the Commissioner to hold such a hearing. Although the Commissioner included some factual findings in his order, the issues presented to the Commissioner were based on legal interpretations of the Enabling Act, the Arizona Constitution, and state statutes. Thus, we find no abuse of discretion in the Commissioner's decision not to grant a hearing on the auction protest.

### CONCLUSION

¶ 28 For the foregoing reasons, we deny Petitioner's request for relief because the Commissioner's appraisal substantially com-plied with the Enabling Act, the Arizona Constitution, and Arizona statutes.

CONCURRING: DONN KESSLER, Presiding Judge, MAURICE PORTLEY, Judge.

