957 P.2d 984

Armando RUIZ, Linda Aguirre, John Philip Evans, Rosie Garcia, Candido Mercado, Manuel Pena, Jr., Peter Rios, Jr., Macario Saldate IV, Federico Sanchez and Victor Soltero, Plaintiffs/Appellants/ Cross–Appellees,

v.

Jane Dee HULL, Governor of Arizona; Grant Woods, Attorney General of Arizona; State of Arizona; Arizonans for Official English and Robert D. Park, Intervenors, Defendants/Appellees/Cross–Appellants.

No. CV–96–0493–PR.

Supreme Court of Arizona, En Banc.

April 28, 1998.

Grant Woods, Attorney General by Rebecca White Berch, Assistant Attorney General, Paula S. Bickett, Assistant Attorney General, Thomas I. McClory, Assistant Attorney General, Phoenix, for Jane Dee Hull, Grant Woods, and The State of Arizona.

Stephen G. Montoya and Albert M. Flores, Phoenix, for Appellant Plaintiffs/Appellants/Cross–Appellees.

Morrison & Hecker, L.L.P. by James F. Henderson, Tyler Q. Swensen, Phoenix, for Arizonans for Official English and Robert D. Park.

Mexican American Legal Defense and Education Fund, Los Angeles, CA, by Irma Rodriguez and Legal Aid Society of San Francisco Employment Law Center, San Francisco, CA, and American Civil Liberties Union of Northern California, Inc., San Francisco, CA, and Ortega & Associates, P.C. by Daniel R. Ortega, Jr., Phoenix, for Mexican American Legal Defense and Education Fund.

Hanson, Bridgett, Marcus, Vlahos & Rudy by Robert L. Rusky, San Francisco, CA, for American Civil Liberties Union of Northern California and Legal Aid Society of San Francisco, Employment Law Center.

Brown & Bain, P.A. by Antonio T. Viera, Phoenix, for Arizona Civil Liberties Union; Los Abogados Hispanic Bar Association; League of United Latin American Citizens; Arizona Hispanic Coalition; Arizona Hispanic Chamber of Commerce; Arizona Hispanic Community Forum; Chicanos Por La Causa.

Roderick G. McDougall, Phoenix City Attorney by Paul L. Badalucco, Assistant Phoenix City Attorney, Phoenix, for City of Phoenix.

Perez & Choi by Hyung S. Choi, Phoenix, Karen K. Narasaki, Washington, D.C., Sandra Del Valle, New York, N.Y., for Puerto Rican Legal Defense & Education Fund; National Asian Pacific American Legal Consortium, et al.

Herb Yazzie, Attorney General, Navajo Nation by Kimberly A. Rozak, Navajo National Department of Justice, Window Rock, for the Navajo Nation.

Dominguez & Associates, P.C. by Antonio Dominguez, Phoenix, and Steven R. Shapiro, Marjorie Heins, New York, N.Y., and Edward M. Chen and Hanson, Bridgett, Marcus, Vlahos & Rudy by Robert L. Rusky, San Francisco, CA, for American Civil Liberties Union and American Civil Liberties Union Foundation of Northern California.

Jennings & Haug by Robert O. Dyer, Stacy A. Dowdell, Phoenix, and Ginsburg, Feldman & Bress by Leonard J. Henzke, Jr., Washington, D.C., for U.S. English, Inc.

Brown & Bain, P.A. by Stephen E. Lee and Peter M. Tiersma, Loyola Law School, Phoenix, for Linguistic Society of America.

Donald W. Jansen, Arizona House of Representatives, Phoenix, for Arizona Legislators.

Ortega & Associates, P.C. by Daniel R. Ortega, Jr., Phoenix, and Christopher Ho, Legal Aid Society of San Francisco Employment Law Center and Hanson, Bridgett, Marcus, Vlahos & Rudy by Robert L. Rusky, San Francisco, CA, and Theresa Fay–Bustillos, Mexican American Legal Defense & Educational Fund, Los Angeles, CA, for Mexican American Legal Defense and Educational Fund and Employment Law Center.

Osborn Maledon, P.A. by Andrew D. Hurwitz, Phoenix, and Crowell & Moring, L.L.P. by Joseph N. Onek, William D. Wallace, Javier M. Guzman, Scott E. Gant, Washington, D.C., for National Council of La Raza; Ayuda, Inc.; Arizona Hispanic Chamber of Commerce Foundation; Centro de Amistad, Inc.; Chicanos Por La Causa, Inc; Friendly House, Inc.; Housing for Mesa, Inc.; Valle Del Sol, Inc.

Snell & Wilmer, L.L.P. by Martha E. Gibbs, Phoenix, and Paul, Weiss, Rifkind, Wharton & Garrison by Jodi A. Danzig, Allan Blumstein, New York, N.Y., for Human Rights Watch.

Steptoe & Johnson, L.L.P. by Bennett Evan Cooper, Phoenix, Richard K. Willard and Washington Legal Foundation by Daniel J. Popeo, Richard A. Samp, Washington, D.C., for Washington Legal Foundation; Claremont Institute for the Study of Statesmanship and Political Philosophy; Allied Educational Foundation; United States Representatives Charles T. Canady; Matt Salmon; Bob Stump; Bob Barr; Bill Barrett; Doug Bereuter; Chris Cannon; Jon Christensen; John T. Doolittle; Bob Goodlatte; Doc Hastings; Asa Hutchinson; Peter King; William Lipinski; Ron Paul; Ed Royce; F. James Sensenbrenner, Jr.; Gerald B. Solomon.

## OPINION

MOELLER, Justice.

### SUMMARY

¶ 1 This opinion addresses the constitutionality of Article XXVIII of the Arizona Constitution (the "Amendment"), which was adopted in 1988 and which provides, *inter alia*, that English is the official language of the State of Arizona and that the state and its political subdivisions—including all government officials and employees performing government business—must "act" only in English.

¶ 2 We hold that the Amendment violates the First Amendment to the United States Constitution because it adversely impacts the constitutional rights of non-English-speaking persons with regard to their obtaining access to their government and limits the political speech of elected officials and public employees. We also hold that the Amendment violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it unduly burdens core First Amendment rights of a specific class without materially advancing a legitimate state interest.

¶ 3 In making these rulings, we express no opinion concerning the constitutional validity of less restrictive English-only provisions discussed in this opinion. We also emphasize that nothing in this opinion compels any Arizona governmental entity to provide any service in a language other than English.

### FACTS AND PROCEDURAL BACKGROUND

#### I. The Amendment

¶ 4 In October 1987, Arizonans for Official English ("AOE") initiated a petition drive to amend Arizona's constitution to designate English as the state's official language and to require state and local governments in Arizona to conduct business only in English. As a result of the general election in November 1988, the Amendment was added to the Arizona Constitution, receiving affirmative votes from 50.5% of Arizona citizens casting ballots. *See Yniguez v. Arizonans for Official English* ("AOE"), 69 F.3d 920, 924 (9th Cir.1995) (en banc).[1] The Amendment, entitled "English as the Official Language," is set forth in full in the Appendix and provides that "[t]he State and all political subdivisions of [the] State shall act in English and in no other language." The Amendment binds all government officials and employees in Arizona during the performance of all government business, and provides that any "person who resides in or does business in this State shall have standing to bring suit to enforce this article in a court of record of the State."

### II. *Yniguez v. Mofford*

¶ 5 Two days after the voters passed the Amendment, Maria–Kelley F. Yniguez sued the State of Arizona, the Governor, and various parties pursuant to 42 U.S.C. § 1983 in the United States District Court for the District of Arizona, seeking to enjoin enforcement of the Amendment and to have it declared unconstitutional under the First and Fourteenth Amendments. She also contended that it violated federal civil rights laws. *Yniguez v. Mofford*, 730 F.Supp. 309 (D.Ariz. 1990). When she filed her action, Yniquez was employed by the Arizona Department of Administration and handled medical malpractice claims asserted against the state. Yniguez was bilingual, fluent and literate in both Spanish and English, and, prior to the Amendment's passage, she communicated in Spanish with monolingual Spanish-speaking claimants and in a combination of English and Spanish with bilingual claimants. *Id.* at 310.

¶ 6 By the time the district court ruled, only the Governor remained as a defendant. *Id.* The district court granted declaratory

1. As pointed out *infra*, the Ninth Circuit's opinion in *Yniguez v. AOE* was vacated by the United States Supreme Court because Yniguez lacked standing. *AOE v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), *vacated on remand, Yniguez v. AOE*, 118 F.3d 667 (9th Cir. 1997). On the merits of the case, however, we agree with the result and with much of the reasoning of the Ninth Circuit opinion. Thus, we refer to the Ninth Circuit opinion throughout this opinion, recognizing that it has been vacated on grounds unrelated to the merits of the issues with which we are presented.

relief, finding that the Amendment was facially overbroad in violation of the First Amendment. *Id.* at 313. Injunctive relief, however, was denied because there was no enforcement action pending against Yniguez. *Id.* at 317. The Governor did not appeal the decision. The Attorney General of Arizona, AOE, and Robert D. Park, a principal sponsor of the Amendment, then moved to intervene for purposes of pursuing an appeal. The district court denied the motion. *Yniguez v. Mofford,* 130 F.R.D. 410 (D.Ariz. 1990).

¶ 7 The Ninth Circuit Court of Appeals reversed the district court's denial and also allowed Arizonans Against Constitutional Tampering, the principal opponent of the Amendment, to intervene as plaintiffs-appellees. *Yniguez v. AOE,* 42 F.3d 1217, 1223–24 (9th Cir.1994). The intervention of the Arizona Attorney General was permitted for the limited purpose of urging adoption of his narrow interpretation of the Amendment discussed below or, alternatively, to urge the certification of the interpretation of the Amendment to this court pursuant to Arizona Revised Statutes Annotated ("A.R.S.") § 12–1861.[2]

¶ 8 The State of Arizona filed a suggestion of mootness because Yniguez was no longer employed by the State of Arizona. The court of appeals rejected the suggestion of mootness, reasoning that Yniguez had a right to appeal the district court's failure to award nominal damages to her and, therefore, had a sufficient concrete interest in the outcome of the litigation to confer standing to pursue declaratory relief. *Yniguez v. Arizona,* 975 F.2d 646, 647 (9th Cir.1992) (citations omitted).

¶ 9 AOE appealed the district court's judgment that declared the Amendment unconstitutional and Yniguez cross-appealed the denial of nominal damages. A panel of the Ninth Circuit Court of Appeals agreed with the district court that the Amendment is unconstitutionally overbroad and also held that Yniguez was entitled to nominal damages. *Yniguez v. AOE,* 42 F.3d at 1229, 1243. The Ninth Circuit then reheard the case en banc and affirmed. *Yniguez v. AOE,* 69 F.3d at 947.

¶ 10 AOE petitioned for certiorari to the United States Supreme Court, which granted the petition and ordered additional briefing on whether the petitioners had standing to maintain the action and whether there remained a federal case or controversy with respect to Yniguez, in light of the fact that she was no longer employed by the State of Arizona. In a unanimous decision, the Supreme Court vacated the Ninth Circuit opinion and remanded to that court with directions that the action be dismissed. *AOE v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 1075, 137 L.Ed.2d 170 (1997). The Court held there was no case or controversy to support federal court jurisdiction and determined that the lower court decisions should be vacated because the Ninth Circuit should have certified the construction of the Amendment to this court. *Id.,* 117 S.Ct. at 1074. In doing so, the Court expressed no opinion on the constitutionality of the Amendment. *Id.* at 1060.

### III. This Litigation

¶ 11 In November 1992, the ten plaintiffs in this case brought an action in superior court against then-Governor J. Fife Symington, III and the Attorney General. On September 5, 1997, Governor Symington resigned and was succeeded by Jane Dee Hull, who has been substituted pursuant to Rule 27(c)(1) of the Arizona Rules of Civil Appellate Procedure. The plaintiffs sought a declaratory judgment that the Amendment violates the First, Ninth, and Fourteenth Amendments of the United States Constitution. The plaintiffs are four elected officials,[3]

---

**2.** The Ninth Circuit affirmed the district court's denial of the Arizona Attorney General's Motion to Intervene insofar as he sought to be reinstated as a party in the appeal, but permitted the intervention for the limited purpose described. *See Yniguez v. Arizona,* 939 F.2d 727, 740 (9th Cir. 1991). The district court had refused to certify the question of the proper interpretation of the Amendment to this court, ruling that certification was inappropriate because the Amendment is not susceptible of a narrowing construction, and therefore could not be held constitutional. *See Yniguez v. Mofford,* 130 F.R.D. at 411.

**3.** Arizona State Senator Joe Eddie Lopez was substituted for retired Senator Manuel Pena by this court's order of May 2, 1997.

five state employees, and one public school teacher. They are all bilingual and regularly communicate in both Spanish and English as private citizens and during the performance of government business. Plaintiffs allege that they speak Spanish during the performance of their government jobs and that they "fear communicating in Spanish 'during the performance of government business' in violation of Article XXVIII of the Arizona Constitution."

¶ 12 The principal sponsors of the Amendment, AOE and Robert D. Park, AOE's spokesperson, intervened as defendants. On cross-motions for summary judgment, the superior court ruled that the Amendment is constitutional, finding that it (1) is a content-neutral regulation that does not violate the First Amendment; (2) does not violate the Equal Protection Clause of the Fourteenth Amendment because there is no proof of discriminatory intent; and (3) does not violate the Ninth Amendment because it does not protect choice of language.[4] The trial court denied AOE's request for attorneys' fees pursuant to A.R.S. § 12–2030, and AOE appealed that denial. Under this opinion, AOE is no longer a prevailing party so we do not discuss its request for attorneys' fees further.

¶ 13 On appeal, the court of appeals reversed in part and affirmed in part. *Ruiz v. AOE,* 218 Ariz. Adv. Rep. 9 (App.1996). Citing the principle of judicial comity, the court held that "it is appropriate for us to exercise our discretion and defer to the federal litigation and thereby accept the construction of Article [XXVIII] and the analysis that was set forth by the Ninth Circuit." 1996 WL 309512 at *4, 218 Ariz. Adv. Rep. at 12. The state defendants petitioned this court for review, which we granted. In 1996, we stayed all proceedings pending the Supreme Court's decision in *AOE v. Arizona.*

¶ 14 As already noted, in 1997 the United States Supreme Court held that Yniguez' federal court claim was moot and remanded with directions that it be dismissed. Plaintiffs then filed a motion in this court to lift the stay and requested leave to submit supplemental briefs and for oral argument. AOE filed a motion to vacate our order granting review. AOE maintained, in essence, that there was no court of appeals decision for this court to review because the court of appeals had adopted the Ninth Circuit's construction and analysis of the Amendment, *see Yniguez v. AOE,* 69 F.3d at 947, and the United States Supreme Court had vacated the Ninth Circuit's opinion. The result, AOE argued, was that the court of appeals' opinion was "eradicated." Thus, AOE requested us to either affirm the trial court's judgment or to return the matter to the court of appeals for consideration. We denied AOE's motion to vacate the order granting review and granted plaintiffs' motion to lift the stay.

¶ 15 This court then received supplemental briefing and heard oral argument from the parties. In addition, numerous amici curiae briefs were filed on behalf of a host of organizations and individuals. We reviewed, considered, and appreciate the many amici briefs which advanced varying positions in this case. However, in accordance with our practice, we base our opinion solely on legal issues advanced by the parties themselves. *See Town of Chino Valley v. City of Prescott,* 131 Ariz. 78, 84, 638 P.2d 1324, 1330 (1981), *appeal dismissed,* 457 U.S. 1101, 102 S.Ct. 2897, 73 L.Ed.2d 1310, *reh. denied,* 459 U.S. 899, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982), citing *City of Tempe v. Prudential Ins. Co.,* 109 Ariz. 429, 510 P.2d 745 (1973) (holding that amici curiae are not permitted to create, extend, or enlarge issues beyond those raised and argued by the parties). Because we resolve the case on the merits as presented by the parties, we do not discuss the concerns referred to in the special concurrence because, as the special concurrence itself observes, the parties have not raised, briefed, or argued any matter referred to by the special concurrence.

¶ 16 We have jurisdiction pursuant to A.R.S. § 12–102.21.

### ISSUES

¶ 17 1. Whether the trial court erred by ruling that the Amendment did not vio-

---

4. No Ninth Amendment issue has been presented to us on appeal.

late the First Amendment to the United States Constitution because it was content-neutral, did not reach constitutionally-protected free speech rights, and was thus not fatally overbroad.

¶ 18 2. Whether the trial court erred by concluding that the Amendment did not violate the Fourteenth Amendment to the United States Constitution because there was no proof of discriminatory intent.

## DISCUSSION

### I. Introduction

¶ 19 Plaintiffs contend that the Amendment is a blanket prohibition against all publicly elected officials and government employees using any language other than English in the performance of any government business. Therefore, they reason that the Amendment is a content-based regulation of speech contrary to the First Amendment. Plaintiffs also argue that the Amendment constitutes discrimination against non-English-speaking minorities, thereby violating the Equal Protection Clause of the Fourteenth Amendment. AOE and the state defendants respond that the Amendment should be narrowly read and should be construed as requiring the use of English only with regard to "official, binding government acts." They argue that this narrow construction renders the Amendment constitutional.

¶ 20 At the outset, we note that this case concerns the tension between the constitutional status of language rights and the state's power to restrict such rights. On the one hand, in our diverse society, the importance of establishing common bonds and a common language between citizens is clear. *Yniguez v. AOE*, 69 F.3d at 923, citing *Guadalupe Organization, Inc. v. Tempe Elementary Sch. Dist.*, 587 F.2d 1022, 1027 (9th Cir.1978). We recognize that the acquisition of English language skills is important in our society. For instance, as a condition to Arizona's admission to the Union, Congress re-

quired Arizona to create a public school system and provided that "said schools shall always be conducted in English." Act of June 20, 1910, ch. 310, § 20(4). That same Act requires all state officers and members of the Legislature to have the "ability to read, write, speak and understand the English language sufficiently well to conduct the duties of the office without the aid of an interpreter." *Id.,* § 20(5). Also, the Sixth Amendment permits an English language requirement for jurors. *United States v. Benmuhar,* 658 F.2d 14, 18–20 (1st Cir.1981) (noting that state's significant interest in having branch of national court system operate in national language rebutted defendant's prima facie showing that English proficiency requirement for jurors resulted in underrepresentation). Congress has recognized the importance of understanding English in such matters as naturalization legislation, 8 U.S.C. § 1423, and the need for the education of non-English-speaking students, Equal Educational Opportunity Act of 1974, 20 U.S.C. §§ 1701–1758. Indeed, Arizona law mandates that school districts in which there are pupils who have limited English proficiency [5] shall provide programs of bilingual instruction or English as a second language with a primary goal of allowing the pupils to become proficient in English in order to succeed in classes taught in English. A.R.S. § 15–752. Finally, the importance of acquiring English skills is emphasized in the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1255a(b)(1)(D), which legalizes resident status of illegal immigrants who demonstrate progress toward learning English, and terminates legal residence for those who make little or no progress, 8 U.S.C. § 1255a(b)(2)(C).

¶ 21 Indeed, English is also the language of political activity through initiative petition. *See Montero v. Meyer,* 861 F.2d 603 (10th Cir.1988) (providing that initiative petitions that are printed only in English are not covered by and do not offend provisions of

---

**5.** "Limited English proficient" is defined as having a "low level of skill in comprehending, speaking, reading or writing the English language because of being from an environment in which

another language is spoken." A.R.S. § 15–751(1). Article 20, paragraph 7 of the Arizona Constitution provides that Arizona public schools shall be conducted in English.

the Voting Rights Act); *accord Delgado v. Smith,* 861 F.2d 1489 (11th Cir.1988).

¶ 22 However, the American tradition of tolerance "recognizes a critical difference between encouraging the use of English and repressing the use of other languages." *Yniguez v. AOE,* 69 F.3d at 923. We agree with the Ninth Circuit's statement that Arizona's rejection of that tradition by enacting the Amendment has severe consequences not only for Arizona's public officials and employees, but also for the many thousands of persons who would be precluded from receiving essential information from government employees and elected officials in Arizona's governments. *Id.* If the wide-ranging language of the prohibitions contained in the Amendment were to be implemented as written, the First Amendment rights of all those persons would be violated, *id.,* a fact now conceded by the proponents of the Amendment, who, instead, urge a restrictive interpretation in accordance with the Attorney General's narrow construction discussed below.

¶ 23 By this opinion, we do not imply that the intent of those urging passage of the Amendment or of those who voted for it stemmed from linguistic chauvinism or from any other repressive or discriminatory intent.[6] Rather we assume, without deciding, that the drafters of the initiative urged passage of the Amendment to further social harmony in our state by having English as a common language among its citizens.

¶ 24 This court must interpret the Amendment as a whole and in harmony with other portions of the Arizona Constitution. *State ex rel. Nelson v. Jordan,* 104 Ariz. 193, 196, 450 P.2d 383, 386 (1969); *State ex rel. Jones v. Lockhart,* 76 Ariz. 390, 398, 265 P.2d 447, 453 (1953). And, if possible, we must construe the Amendment to avoid conflict with the United States Constitution. *AOE v. Arizona,* 117 S.Ct. at 1074.

¶ 25 Every duly enacted state and federal law is entitled to a presumption of constitutionality. *Town of Lockport v. Citizens for Community Action at Local Level, Inc.,* 430 U.S. 259, 272–73, 97 S.Ct. 1047, 1055–56, 51 L.Ed.2d 313 (1977); *Eastin v. Broomfield,* 116 Ariz. 576, 580, 570 P.2d 744, 748 (1977). The presumption applies equally to initiatives as well as statutes, and where alternative constructions are available, the court should choose the one that results in constitutionality. *Slayton v. Shumway,* 166 Ariz. 87, 92, 800 P.2d 590, 595 (1990); *Hernandez v. Frohmiller,* 68 Ariz. 242, 249, 204 P.2d 854, 859 (1949). However, as discussed more fully below, where the regulation in question impinges on core constitutional rights, the standards of strict scrutiny apply and the burden of showing constitutionality is shifted to the proponent of the regulation. *See generally Rosen v. Port of Portland,* 641 F.2d 1243, 1246, 1249 (9th Cir.1981) (laws restricting speech face a heavy presumption against their constitutional validity and proponents bear burden of establishing that they are "narrowly tailored" to further a "compelling" government interest); *see also Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 576, 111 S.Ct. 2456, 2465–66, 115 L.Ed.2d 504 (1991) (Scalia, J., concurring). Mindful of these principles, we turn now to an analysis of the constitutionality of the Amendment.

## II. Attorney General's Opinion

¶ 26 On its face, the Amendment provides that, except for some enumerated narrow exceptions, English is the official language of the State of Arizona, of all political

---

6. We fully recognize that the power of the people to legislate is as great as that of the Legislature. *See* Ariz. Const. art. IV; *Salt River Pima–Maricopa Indian Community v. Hull,* 190 Ariz. 97, 103, 945 P.2d 818, 824 (1997); *Queen Creek Land & Cattle Corp. v. Yavapai County Board of Sup'rs,* 108 Ariz. 449, 451, 501 P.2d 391, 393 (1972). However, we note that the search for the people's intent in passing initiatives is far different from the attempt to discern legislative intent: there are no legislative hearing transcripts, committee reports or other legislative history. Before an initiative is passed, no committee meetings are held; no legislative analysts study the law; no floor debates occur; no separate representative bodies vote on the legislation; no reconciliation conferences are held; no amendments are drafted; no executive official wields a veto power and reviews the law under that authority; and it is far more difficult for the people to "reconvene" to amend or clarify a law if a court interprets it contrary to the voters' intent. *See* Jane S. Schacter, *The Pursuit of "Popular Intent": Interpretive Dilemmas in Direct Democracy,* 105 Yale L.J. 107, 109 (1995).

subdivisions, of the ballot, the public schools, and government functions and actions. The exceptions pertain to the teaching of English as a second language, matters required by federal law, any matter pertaining to the protection of public health or safety, or of the rights of criminal defendants or victims of crime. *See* Appendix. Before making a facial analysis of the Amendment, however, we must first determine the propriety of adopting the Attorney General's proposed narrowing construction.

¶ 27 In 1989, shortly after the Amendment was passed, Robert Corbin, then Attorney General, issued an opinion upholding the constitutionality of the Amendment, based upon a narrow construction of the Amendment. Ariz. Att'y Gen. Op. I89–009 (1989); *see also* Ariz. Att'y Gen. Ops. I89–013 and – 014 (1989).

■ ¶ 28 Opinions of the Attorney General are advisory. *Green v. Osborne,* 157 Ariz. 363, 365, 758 P.2d 138, 140 (1988), and are not binding. *Marston's Inc. v. Roman Catholic Church,* 132 Ariz. 90, 94, 644 P.2d 244, 248 (1982) (in division). However, the reasoned opinion of a state attorney general should be accorded respectful consideration. *See AOE v. Arizona,* 117 S.Ct. at 1073 n. 30, citing *Huggins v. Isenbarger,* 798 F.2d 203, 207–10 (7th Cir.1986) (Easterbrook, J., concurring).

¶ 29 While we duly consider the Attorney General's proposed narrowing construction, we reject that construction for three substantive reasons, each of which we discuss in turn. First, the proffered narrowing construction does not comport with the plain wording of the Amendment, and hence, with the plain meaning rule guiding our construction of statutes and provisions in the Arizona Constitution. Second, it does not comport with the stated intent of the drafters of the Amendment. Third, it suffers from both ambiguity and implausibility. Therefore, the narrowing construction is rejected because the Amendment's clear terms are not "readily susceptible" to the constraints that the Attorney General attempts to place on them. *Yniguez v. AOE,* 69 F.3d at 929; *see also Virginia v. American Booksellers Ass'n,* 484 U.S. 383, 395, 108 S.Ct. 636, 644, 98 L.Ed.2d

782 (1988) (refusing to accept as authority a non-binding attorney general opinion where narrowing construction advocated by attorney general was not in accordance with the plain meaning of the statute).

## A. Plain Meaning Rule

¶ 30 The Attorney General maintains that although the Amendment declares English to be Arizona's "official" language, its proscriptions against the use of non-English languages should be interpreted to apply only to "official acts of government." Ariz. Att'y Gen. Op. I89–009, at 5–6. The Attorney General defines "official act" as "a decision or determination of a sovereign, a legislative council, or a court of justice." *Id.* at 7. Although he does not further explain what acts would be official, the Attorney General concludes that the Amendment should not be read to prohibit public employees from using non-English languages while performing their public functions that could not be characterized as official. The Attorney General opines that the provision "does not mean that languages other than English cannot be used when reasonable to facilitate the day-to-day operation of government." *Id.* at 10.

¶ 31 Somewhat curiously, intervenors now agree with the Attorney General that the Amendment should be held to govern only binding, official acts of the state, which they also seek to construe narrowly as "formal rule-making or rate making . . . or any other policy matters." AOE and the state defendants also point to the definition of "official act" adopted by the court in *Kerby v. State ex rel. Frohmiller,* 62 Ariz. 294, 310–11, 157 P.2d 698, 705–06 (1945). The court there defined "official acts" as "acts by an officer in his official capacity under color and by virtue of his office." *Id.* However, assuming, without deciding, that the government could require official acts to be conducted in English only, nothing in the language of the Amendment remotely supports such a limiting construction.

¶ 32 To arrive at his interpretation, the Attorney General takes the word "act" from § 3(1)(a) of the Amendment, which provides that, with limited exceptions, the "State and

all political subdivisions of this State shall act in English and in no other language." (Emphasis added.) The Attorney General proposes that the word "act" from § 3(1)(a) should be ascribed to the word "official," found in the Amendment's proclamation that English is the official language of Arizona. Therefore, the Attorney General interprets the Amendment to apply only to the official acts of the state and limits the definition of the noun "act" to a "decision or determination of a sovereign, a legislative council, or a court of justice." Op. Atty. Gen. Az. No. I89–009, at 7 (*quoting Webster's International Dictionary* 20 (3d ed., unabridged, 1976) (third meaning of "act")). We agree with the Ninth Circuit in *Yniguez v. AOE* that the former Attorney General's opinion ignores the fact that "act," when used as a verb as in the Amendment, does not include among its meanings the limited definition he proposed. 69 F.3d at 929. Similarly, section 1(2) of the Amendment also describes English as the language of "all government functions and actions." The Amendment does not limit the terms "functions" and "actions" to official acts as urged by the Attorney General, and the ordinary meanings of those terms do not impose such a limitation. *Id.* at 929 n. 13. We agree with the district court that originally evaluated the challenges to the Amendment in *Yniguez:* "The Attorney General's restrictive interpretation of the Amendment is in effect a 'remarkable job of plastic surgery upon the face of the [Amendment].'" *Yniguez v. Mofford,* 730 F.Supp. at 316, citing *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 153, 89 S.Ct. 935, 940, 22 L.Ed.2d 162 (1969).

¶ 33 We hold that by ignoring the express language of the Amendment, the Attorney General's proposed construction violates the plain meaning rule that requires the words of the Amendment to be given their natural, obvious, and ordinary meaning. *County of Apache v. Southwest Lumber Mills, Inc.,* 92 Ariz. 323, 327, 376 P.2d 854, 856 (1962). By its express terms, the Amendment is not limited to official governmental acts or to the "formal, policy making, enacting and binding activities of government." Rather, it is plainly written in the broadest possible terms, declaring that the

"English language is the language of ... *all government functions and actions* " and prohibiting all "government officials and employees" at every level of state and local government from using non-English languages *"during the performance of government business."* Amendment, §§ 1(2), 1(3)(a)(iv) (emphasis added).

## B. Legislative Intent

¶ 34 We also believe the Attorney General's proposed construction is at odds with the intent of the drafters of the Amendment. The drafters perceived and obviously intended that the application of the Amendment would be widespread. They therefore inserted some limited exceptions to it. Those exceptions permit the use of non-English languages to protect the rights of criminal defendants and victims, to protect the public health and safety, to teach a foreign language, and to comply with federal laws. Amendment, § 3.2. Regardless of the precise limits of these general exceptions, their existence demonstrates that the drafters of the Amendment understood that it would apply to far more than just official acts.

¶ 35 For example, one exception allows public school teachers to instruct in a non-English language when teaching foreign languages or when teaching students with limited English proficiency. Such instruction by teachers is obviously not a "formal, policy making, enacting or binding activity by the government," the narrow construction urged by the Attorney General. The exceptions would have been largely, if not entirely, unnecessary under the Attorney General's proposed construction of the Amendment. When construing statutes, we must read the statute as a whole and give meaningful operation to each of its provisions. *Kaku v. Arizona Board of Regents,* 172 Ariz. 296, 297, 836 P.2d 1006, 1007 (App.1992).

¶ 36 In construing an initiative, we may consider ballot materials and publicity pamphlets circulated in support of the initiative. *Bussanich v. Douglas,* 152 Ariz. 447, 450, 733 P.2d 644, 647 (App.1986). The ballot materials and publicity pamphlets pertaining to the Amendment do not support

the Attorney General's limiting construction. In AOE's argument for the Amendment, Chairman Robert D. Park stated that the Amendment was intended to "require the government to *function in English,* except in certain circumstances," and then listed those exceptions set forth in section 4 of the Amendment (emphasis added). Chairman Park's argument then went on to state that "*[o]fficially sanctioned multilingualism causes tension and division within a state.* Proposition 106 [enacting the Amendment] will *avoid that fate* in Arizona." (Emphasis added.) The Legislative Council's argument in support of the Amendment stated that the existence of a multilingual society would lead to "the fears and tensions of language rivalries and ethnic distrust." Arizona Publicity Pamphlet in Support of the Amendment, at 26. Therefore, the Amendment's legislative history supports a broad, comprehensive construction of the Amendment, not the narrow construction urged by the Attorney General.

## C. Ambiguity

¶ 37 The Attorney General's interpretation would unnecessarily inject elements of vagueness into the Amendment. We feel confident that an average reader of the Amendment would never divine that he or she was free to use a language other than English unless one was performing an official act defined as "a decision or determination of a sovereign, a legislative council, or a court of justice." [7]

¶ 38 Because we conclude that the narrow construction advocated by the Attorney General is untenable, we analyze the constitutionality of the Amendment based on the language of the Amendment itself.

## III. English–Only Provisions in Other Jurisdictions

¶ 39 Although English-only provisions have recently become quite common, Arizona's is unique. Thus, we receive little guidance from other state courts. Twenty-one states [8] and forty municipalities [9] have official English statutes. However, most of those provisions are substantially less encompassing and certainly less proscriptive than the Amendment. The official English provisions in most states appear to be primarily symbolic. *See, e.g., Puerto Rican Org. for Political Action v. Kusper,* 490 F.2d 575, 577 (7th Cir.1973) (noting that official English law appears with laws naming the state bird and state song, and does not restrict the use to non-English languages by state and city agencies). Indeed, the Amendment has been identified as "by far the most restrictively worded official-English law to date." M. Arrington, Note, *English Only Laws and Direct Legislation: The Battle in the States Over Language Minority Rights,* 7 L.J. & Pol. 325, 327 (1991). This observation is shared by other commentators—who note that the Amendment "is the *most restrictive* of the current wave of official-language

---

7. Although it is unnecessary for us to address the plaintiffs' separate argument that the Amendment, as written, is unconstitutionally vague (because we hold that the Amendment violates the First and Fourteenth Amendments), we do note that the Attorney General's proposed narrowing construction, if adopted, would undoubtedly add weight to the plaintiffs' vagueness argument. A statute is vague if it fails to give fair notice of what it prohibits. *State ex rel. Purcell v. Superior Court,* 111 Ariz. 582, 584, 535 P.2d 1299, 1301 (1975); *see also Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) (Vagueness is concerned with clarity of law; a law is void on its face, and thereby violates due process, if it is so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application.").

8. Ala. Const. amend 509 (1990); Ariz. Const. art XXVIII (1988); Ark.Code Ann. § 1–4–117 (1987);

Cal. Const. art. III, § 6 (1986); Colo. Const. art. II, § 30a (1988); Fla. Const. art. II § 9 (1988); Ga.Code Ann. § 50–3–100 (1996); Haw. Const. art. XV, § 4 (1978) (also naming Hawaiian as an official language); 5 Ill. Comp. Stat. Ann. 460/20 (West 1993); Ind.Code Ann. § 1–2–10–1 (1984); Ky.Rev.Stat. Ann. § 2.013 (1984); Miss.Code Ann. § 3–3–31 (1987); Mont.Code Ann. § 1–1–510 (1995); Neb. Const. art. 1, § 27 (1920); N.H.Rev.Stat. Ann. § 3–C:1 (1995); N.C. Gen. Stat. § 145–12 (1987); N.D. Cent.Code § 54–02–13 (1987); S.C.Code Ann. § 1–1–696 (1987); S.D. Codified Laws § 1–27–20 (1995); Tenn. Code Ann. § 4–1–404 (1984); Wyo. Stat. Ann. § 8–6–101 (Michie 1996).

9. *See* Cecilia Wong, *Language is Speech: The Illegitimacy of Official English After* Yniguez v. Arizonans for Official English, 30 U.C. Davis L.Rev. 277, 278 (1996).

**452**

laws," and "is so far the *most restrictive* Official English measure." *See* D. Baron, *The English–Only Question* 21 (1990), and J. Crawford, *Hold Your Tongue* 176 (1992) (emphasis added).

¶ 40 In contrast to the Amendment, the official English laws that have been enacted in other states are for the most part brief and nonrestrictive. For instance, Colorado's official English law, Colo. Const. § 30, adopted by the initiative process, provides that the "English language is the official language of the State of Colorado. This section is self executing; however, the General Assembly may enact laws to implement this section." Similarly, the official English statute of Arkansas states: "(a) The English language shall be the official language of the State of Arkansas. (b) This section shall not prohibit the public schools from performing their duty to provide equal educational opportunities to all children." Ark. Stat. Ann. 1–4–117. Florida's 1988 official English law is similar: "(a) English is the official language of the State of Florida. (b) The legislature shall have the power to enforce this section by appropriate legislation." Fla. Const. Art. II, § 9 (1988). Indeed, three states have simply enacted a provision which declares that English is the official language of the state: Illinois, 5 Ill. Comp. Stat. Ann. § 460/20; Kentucky, Ky.Rev.Stat. § 2.013; and Indiana, Ind.Code Ann. § 1–2–10–1.

¶ 41 The more detailed official English laws contain provisions which avoid some of the constitutional questions presented by the Amendment. For instance, Wyoming's law provides, in pertinent part, that:

(a) English shall be designated as the official language of Wyoming. Except as otherwise provided by law, no state agency or political subdivision of the state shall be required to provide any documents, information, literature or other written materials in any language other than English. (b) A state agency or political subdivision or its officers or employees may act in a language other than the English language for any of the following purposes: (i) To provide information orally to individuals in the course of delivering services to the general public .... (vii) To promote international commerce, trade or tourism.

Wyo. St. 8–6–101.

¶ 42 Similarly, Montana's official English law protects the free speech rights of state employees and elected officials by allowing them to use non-English languages in the course and scope of their employment, stating in pertinent part:

This section is *not* intended to violate the federal or state constitutional right to freedom of speech of government officers and employees acting in the course and scope of their employment. This section does *not* prohibit a government officer or employee acting in the course and scope of their employment from using a language other than English, including use in a government document or record, if the employee chooses.

Mont.Code Ann. § 1–1–510 (emphasis added).

¶ 43 Finally, although California's official English law, passed as an initiative in 1986, is specific and lengthy, it does not prohibit the use of languages other than English.[10] If

10. California's Official English law, Cal. Const., Art. III, § 6, provides that:

(a) *Purpose*
English is the common language of the people of the United States of America and the State of California. This section is intended to preserve, protect and strengthen the English language, and not to supersede any of the rights guaranteed to the people by this Constitution.
(b) *English as the Official Language of California*
English is the official language of the State of California.
(c) *Enforcement*

The Legislature shall enforce this section by appropriate legislation. The Legislature and officials of the State of California shall take all steps necessary to insure that the role of English as the common language of the State of California is preserved and enhanced. The Legislature shall make no law which diminishes or ignores the role of English as the common language of the State of California.
(d) *Personal Right of Action and Jurisdiction of Courts*
Any person who is a resident of or doing business in the State of California shall have standing to sue the State of California to enforce this section, and the Courts of record of the State of California shall have jurisdiction to

Arizona's Amendment were merely symbolic or contained some of the express exceptions of the official English provisions discussed above, it might well have passed constitutional muster. We do not express any opinion concerning the constitutionality of less restrictive English-only provisions. We turn now to a discussion of the constitutional questions presented by the Amendment.

## IV. Language is Speech Protected by the First Amendment

 ¶ 44 Unlike other English-only provisions, the Amendment explicitly and broadly prohibits government employees from using non-English languages even when communicating with persons who have limited or no English skills, stating that all "government officials and employees during the performance of government business" must "act in English and no other language." Amendment, §§ 1(3)(a)(iv), 3(1)(a). It also requires every level and branch of government to "preserve, protect and enhance the role of ... English ... as the official language" and prohibits all state and local entities from enacting or enforcing any "law, order, decree or policy which requires the use of a language other than English." §§ 2, 3(1)(b). We agree with the Ninth Circuit that the Amendment "could hardly be more inclusive" and that it "prohibit[s] the use in all oral and written communications by persons connected with the government of all words and phrases in any language other than English." *Yniguez v. AOE*, 69 F.3d at 933.

¶ 45 Assuming *arguendo* that the government may, under certain circumstances and for appropriate reasons, restrict public employees from using non-English languages to communicate while performing their duties, the Amendment's reach is too broad. For example, by its express language, it prohibits a public school teacher, such as Appellant Garcia, and a monolingual Spanish-speaking parent from speaking in Spanish about a child's education. It also prohibits a town hall discussion between citizens and elected individuals in a language other than English

and also precludes a discussion in a language other than English between public employees and citizens seeking unemployment or workers' compensation benefits, or access to fair housing or public assistance, or to redress violations of those rights.

¶ 46 The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

 ¶ 47 The First Amendment applies to the states as well as to the federal government. *Gitlow v. New York*, 268 U.S. 652, 665, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925). The expression of one's opinion is absolutely protected by the First and Fourteenth Amendments. *AMCOR Inv. Corp. v. Cox Ariz. Publications, Inc.*, 158 Ariz. 566, 568, 764 P.2d 327, 329 (App.1988) (citation omitted); *see also Meyer v. Nebraska*, 262 U.S. 390, 401, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923) (stating that the United States Constitution protects speakers of all languages). The trial court held that the Amendment is content-neutral, and, therefore, does not violate the First Amendment. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48, 106 S.Ct. 925, 929–30, 89 L.Ed.2d 29 (1986). That ruling is flawed.

¶ 48 "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 838, 98 S.Ct. 1535, 1541, 56 L.Ed.2d 1 (1978) (footnote omitted) (quoting *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966)). We note that the Amendment, Section 3, acknowledges that its mandate that government act only in English is superseded by the use of foreign languages in schools both to enable students to transi-

---

hear cases brought to enforce this section. The Legislature may provide reasonable and

appropriate limitations on the time and manner of suits brought under this section.

tion to English (subsection 2(a)) and to teach students a foreign language (subsection 2(c)). Subsection 2(b) states that the Amendment's English-only mandate does not apply in instances where foreign language use is required to ensure compliance with federal laws. Therefore, the Amendment would not apply, for instance, with regard to bilingual ballots in Arizona in designated political subdivisions as required by the Voting Rights Act, 42 U.S.C. §§ 1973 aa–1a(c) (forbidding states from conditioning the right to vote on the ability to read, write, understand, or interpret English). Nor would it affect a criminal defendant's right to have a competent translator assist him, at state expense, if need be. *See United States ex rel. Negron v. New York,* 434 F.2d 386, 391 (2d Cir.1970).

¶ 49 Notwithstanding these limited exceptions, we find that the Amendment unconstitutionally inhibits "the free discussion of governmental affairs" in two ways. First, it deprives limited- and non-English-speaking persons of access to information about the government when multilingual access may be available and may be necessary to ensure fair and effective delivery of governmental services to non-English-speaking persons. It is not our prerogative to impinge upon the Legislature's ability to require, under appropriate circumstances, the provision of services in languages other than English. *See, e.g.,* A.R.S. § 23–906(D) (Providing that every employer engaged in occupations subject to Arizona's Workers' Compensation statutes shall post in a conspicuous place upon his premises, in English and Spanish, a notice informing employees that unless they specifically reject coverage under Arizona's compulsory compensation law, they are deemed to have accepted the provisions of that law). The United States Supreme Court has held that First Amendment protection is afforded to the communication, its source, and its recipient. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1822–23, 48 L.Ed.2d 346 (1976).

¶ 50 In his concurring opinion in *Barnes,* Justice Scalia stated, "[W]hen any law restricts speech, even for a purpose that has nothing to do with the suppression of com-

munication ..., we insist that it meet the high First–Amendment standard of justification." 501 U.S. at 576, 111 S.Ct. at 2465–66. The Amendment contravenes core principles and values undergirding the First Amendment—the right of the people to seek redress from their government—by directly banning pure speech on its face. By denying persons who are limited in English proficiency, or entirely lacking in it, the right to participate equally in the political process, the Amendment violates the constitutional right to participate in and have access to government, a right which is one of the "fundamental principle[s] of representative government in this country." *See Reynolds v. Sims,* 377 U.S. 533, 560, 566–68, 84 S.Ct. 1362, 1381, 1383–85, 12 L.Ed.2d 506 (1964). The First Amendment right to petition for redress of grievances lies at the core of America's democracy. *McDonald v. Smith,* 472 U.S. 479, 482–83, 485, 105 S.Ct. 2787, 2790, 2791, 86 L.Ed.2d 384 (1985); *United Mine Workers of America v. Illinois State Bar Assn.,* 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967) (right to petition is "among the most precious liberties safeguarded by the Bill of Rights"). In *Board of Education v. Pico,* 457 U.S. 853, 867, 102 S.Ct. 2799, 2808, 73 L.Ed.2d 435 (1982), the Court recognized that "the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press and political freedom."

¶ 51 The Amendment violates the First Amendment by depriving elected officials and public employees of the ability to communicate with their constituents and with the public. With only a few exceptions, the Amendment prohibits all public officials and employees in Arizona from acting in a language other than English while performing governmental functions and policies. We do not prohibit government offices from adopting language rules for appropriate reasons. We hold that the Amendment goes too far because it effectively cuts off governmental communication with thousands of limited-English-proficient and non-English-speaking persons in Arizona, even when the officials and employees have the ability and desire to communicate in a language understandable to them. Meaningful communication in

those cases is barred. Under such circumstances, prohibiting an elected or appointed governmental official or an employee from communicating with the public violates the employee's and the official's rights. *See, e.g., United States v. National Treasury Employees Union,* 513 U.S. 454, 465–66, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995) (employee commenting on matters of public concern has right to speak, subject to considerations of governmental efficiency); *Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 223, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989) (finding state law violates party officials' rights to spread political message to voters seeking to inform themselves on campaign issues). As the Ninth Circuit noted, the Amendment could "hardly be more inclusive"; it "prohibit[s] the use in all oral and written communications by persons connected with the government of all words and phrases in any language other than English." *Yniguez v. AOE,* 69 F.3d at 933.

¶ 52 Except for a few exceptions, the Amendment prohibits all elected officials from acting in a language other than English while carrying out governmental functions and policies. Several of the plaintiffs in this matter are elected state legislators, who enjoy the "widest latitude to express their views on issues of policy." *Bond v. Floyd,* 385 U.S. 116, 136, 87 S.Ct. 339, 349, 17 L.Ed.2d 235 (1966). Heretofore, when necessary in order to communicate effectively with their constituents, those legislators have spoken their constituents' primary language if those constituents do not speak English well, or at all.

¶ 53 Citizens of limited English proficiency, such as many of the named legislator's constituents, often face obstacles in petitioning their government for redress and in accessing the political system. Legislators and other elected officials attempting to serve limited-English-proficient constituents face a difficult task in helping provide those constituents with government services and in assisting those constituents in both understanding and accessing government. The Amendment makes the use of non-English communication to accomplish that task illegal. In Arizona, English is not the primary language of many

citizens. A substantial number of Arizona's Native Americans, Spanish-speaking citizens, and other citizens for whom English is not a primary language, either do not speak English at all or do not speak English well enough to be able to express their political beliefs, opinions, or needs to their elected officials. Under the Amendment, with few exceptions, no elected official can speak with his or her constituents except in English, even though such a requirement renders the speaking useless. While certainly not dispositive, it is also worth noting that in everyday experience, even among persons fluent in English as a second language, it is often more effective to communicate complex ideas in a person's primary language because some words, such as idioms and colloquialisms, do not translate well, if at all. In many cases, though, it is clear that the Amendment jeopardizes or prevents meaningful communication between constituents and their elected representatives, and thus contravenes core principles and values undergirding the First Amendment.

¶ 54 AOE argues that the "First Amendment addresses [the] content not [the] mode of communication." The trial court adopted this argument, concluding that the Amendment was a permissible content-neutral prohibition of speech. Essentially, AOE argues that strict scrutiny should be reduced in this case because the decision to speak a non-English language does not implicate pure speech rights, but rather only affects the "mode of communication." By requiring that government officials communicate only in a language which is incomprehensible to non-English speaking persons, the Amendment effectively bars communication itself. Therefore, its effect cannot be characterized as merely a time, place, or manner restriction because such restrictions, by definition, assume and require the availability of alternative means of communication. *E.g., Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (requiring the performance of a concert at a lower than desired volume); *see also Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (requiring the distribu-

tion rather than the posting of leaflets on public property).

¶ 55 AOE also argues that the Amendment can be characterized as a regulation that serves purposes unrelated to the content of expression and therefore should be deemed neutral, even if it has an incidental effect on some speakers or messages but not others. *See Ward,* 491 U.S. at 791, 109 S.Ct. at 2754 (citing *City of Renton,* 475 U.S. at 47–48, 106 S.Ct. at 929–30). We agree with the Ninth Circuit's emphatic rejection in *Yniguez v. AOE* of the suggestion that the decision to speak in a language other than English does not implicate free speech concerns, but is instead akin to expressive conduct. There, the court said that "[s]peech in any language is still speech and the decision to speak in another language is a decision involving speech alone." 69 F.3d at 936. *See generally* Cecilia Wong, *Language is Speech: The Illegitimacy of Official English After* Yniguez v. Arizonans for Official English, 30 U.C. Davis L.Rev. 277, 278 (1996).

¶ 56 The United States Supreme Court has observed that "[c]omplete speech bans, unlike content-neutral restrictions on time, place or manner of expression, are particularly dangerous because they all but foreclose alternative means of disseminating certain information." *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 506, 116 S.Ct. 1495, 1507, 134 L.Ed.2d 711 (1996) (internal citation omitted); *see also City of Ladue v. Gilleo,* 512 U.S. 43, 55, 114 S.Ct. 2038, 2045, 129 L.Ed.2d 36 (1994) ("Our prior decisions have voiced particular concern with laws that foreclose an entire medium of expression.").

 ¶ 57 The Amendment poses a more immediate threat to First Amendment values than does legislation that regulates conduct and only incidentally impinges upon speech. *Cf. United States v. O'Brien,* 391 U.S. 367, 375–76, 382, 88 S.Ct. 1673, 1678, 1681–82, 20 L.Ed.2d 672 (1968) (statute prohibiting knowing destruction or mutilation of selective ser-

vice certificate did not abridge free speech on its face); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293–94, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984) (National Park Service regulation forbidding sleeping in certain areas was defensible as a regulation of symbolic conduct or a time, place, or manner restriction). Laws "directed at speech" and communication are subject to exacting scrutiny and must be "justified by the substantial showing of need that the First Amendment requires." *Texas v. Johnson,* 491 U.S. 397, 406, 109 S.Ct. 2533, 2541, 105 L.Ed.2d 342 (1989) (citations omitted); *accord First National Bank of Boston v. Bellotti,* 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978); *Buckley v. Valeo,* 424 U.S. 1, 16–17, 96 S.Ct. 612, 633, 46 L.Ed.2d 659 (1976). Here, the drafters of the Amendment articulated the need for its enactment as promoting English as a common language. The Legislative Council's official argument in favor of the Amendment stated: "The State of Arizona is at a crossroads. It can move toward the fears and tensions of language rivalries and ethnic distrust, or it can reverse this trend and strengthen our common bond, the English language."

¶ 58 Even if the Amendment were characterized as a content- and viewpoint-neutral ban, and we hold such a characterization does not apply, the Amendment violates the First Amendment because it broadly[11] infringes on protected speech. *See National Treasury Employees Union,* 513 U.S. at 470, 115 S.Ct. at 1015 (striking down content-neutral provisions of Ethics Reform Act due to significant burdens on public employee speech and on the "public's right to read and hear what Government employees would otherwise have written and said"). In *National Treasury Employees Union,* the Court recognized that a ban on speech *ex ante* (such as that imposed by the Amendment) constitutes a "wholesale deterrent to a broad category of

---

11. We do not address the plaintiffs' separate overbreadth claim because we hold that the Amendment unconstitutionally infringes on First Amendment rights. Overbreadth should only be addressed where its effect might be salutary. *Massachusetts v. Oakes,* 491 U.S. 576, 581–82, 109 S.Ct. 2633, 2636–37, 105 L.Ed.2d 493

(1989); *see also Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) (holding that applying overbreadth analysis constitutes manifestly strong medicine that is to be employed sparingly and only as a last resort).

expression by a massive number of potential speakers" and thus "chills potential speech before it happens." *Id.* at 467–68, 115 S.Ct. at 1013–14 (footnote omitted) (citation omitted); *see also City of Ladue,* 512 U.S. at 55, 114 S.Ct. at 2045 (holding that even content- and viewpoint-neutral laws can "suppress too much speech"); *Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987) (viewpoint neutral regulation held unconstitutional because it "prohibited *all* protected expression").

¶ 59 The chilling effect of the Amendment's broad applications is reinforced by Section 4 which provides that elected officials and state employees can be sued for violating the Amendment's prohibitions. *See* Appendix. We conclude that the Amendment violates the First Amendment.

## V. Equal Protection

¶ 60 Section One of the Fourteenth Amendment provides, in pertinent part, that "[n]o state shall … deny to any person within its jurisdiction the equal protection of the laws." The right to petition for redress of grievances is one of the fundamental rights guaranteed by the First Amendment. *United Mine Workers,* 389 U.S. at 222, 88 S.Ct. at 356 (right to petition for redress of grievances is among the most precious of the liberties safeguarded by the Bill of Rights). A corollary to the right to petition for redress of grievances is the right to participate equally in the political process. *See Reynolds,* 377 U.S. at 560, 556–68, 84 S.Ct. at 1380, 1379–85 (concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged); *accord Evans v. Romer,* 854 P.2d 1270, 1276 (Colo.1993)("the Equal Protection Clause guarantees the fundamental right to participate equally in the political process and … any attempt to infringe on an independently identifiable group's ability to exercise that

right is subject to strict judicial scrutiny"); *see also Dunn v. Blumstein,* 405 U.S. 330, 335, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (1972) (recognizing fundamental right to participate in state elections on an equal basis with other citizens in the jurisdiction).

¶ 61 The Amendment is subject to strict scrutiny because it impinges upon the fundamental First Amendment right to petition the government for redress of grievances. *United Mine Workers,* 389 U.S. at 222, 88 S.Ct. at 356. The right to petition bars state action interfering with access to the legislature, the executive branch and its various agencies, and the judicial branch. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 137–39, 81 S.Ct. 523, 529–31, 5 L.Ed.2d 464 (1961) (legislature); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (executive); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (administrative agencies and courts); *United Mine Workers,* 389 U.S. at 221–22, 88 S.Ct. at 355–56 (courts).

¶ 62 The trial court rejected plaintiffs' equal protection argument on the grounds that plaintiffs had not shown that the Amendment was driven by discriminatory intent. *See Hunter v. Underwood,* 471 U.S. 222, 229, 105 S.Ct. 1916, 1921, 85 L.Ed.2d 222 (1985). Because the Amendment curtails First Amendment rights, however, it is presumed unconstitutional and must survive this court's strict scrutiny.[12] *See generally Rosen,* 641 F.2d at 1246. AOE and the state defendants bear the burden of establishing the Amendment's constitutionality by demonstrating that it is drawn with narrow specificity to meet a compelling state interest. *Id.* ¶

¶ 63 Challenges to official English pepper history, but, except for its decision in *Yniguez* which was dismissed on standing, the United States Supreme Court has not addressed the constitutionality of official En-

---

**12.** Because strict scrutiny analysis applies to the governmental regulation of speech imposed by the Amendment, we do not address whether a language minority constitutes a suspect class for equal protection purposes. *See San Antonio In-*

*dependent Sch. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (describing the criteria characterizing suspect classification for equal protection purposes).

glish statutes since the 1920s. In *Meyer*, 262 U.S. 390, 43 S.Ct. 625,[13] the Court reviewed a statute forbidding any teacher to "teach any subject to any person in any language other than the English language." The Court held that teachers have the constitutional right to teach, and students have the equivalent right to receive, foreign language instruction. *Id.* at 400–03, 43 S.Ct. at 627–28. In so doing, the Court noted:

> [T]he individual has certain fundamental rights which must be respected. *The protection of the Constitution extends to all, to those who speak other languages as well as to those born with English on the tongue.* Perhaps it would be highly advantageous if all had ready understanding of our ordinary speech, but this cannot be coerced by methods which conflict with the Constitution—a desirable end cannot be promoted by prohibited means.

*Id.* at 401, 43 S.Ct. at 627 (emphasis added).

¶ 64 In *Meyer*, the Court held that the statute violated Fourteenth Amendment due process and equal protection rights. Specifically, the Court held that the Nebraska statute, by forbidding foreign language instruction, was arbitrary and did not reasonably relate to any end within the competency of the state to regulate. *Id.* at 403, 43 S.Ct. at 628. The Court acknowledged that a state has legitimate interests in promoting the civic development of its citizens and that a uniform language might aid this promotion. *Id.* at 401, 43 S.Ct. at 627. The Court held, however, that the statute abrogated the fundamental, individual right of choice of language. *Id.* at 403, 43 S.Ct. at 628. Despite its desirable goals, the Nebraska statute was held to employ prohibited means exceeding the state's powers. *Id.* at 402, 43 S.Ct. at 628. The discriminatory Nebraska law, as applied, thus deprived both teachers and students of their liberty without due process of law. *Id.* at 400–02, 43 S.Ct. at 627–28. We

believe the Amendment suffers from the same constitutional infirmity.

¶ 65 As discussed previously, the compelling state interest test applies to the Amendment because it affects fundamental First Amendment rights. Even assuming *arguendo* that AOE and the state defendants could establish a compelling state interest for the Amendment (and they have not met that burden), they cannot satisfy the narrow specificity requirement. Under certain very restricted circumstances, states may *regulate* speech. *See, e.g., Kovacs v. Cooper,* 336 U.S. 77, 80, 69 S.Ct. 448, 450, 93 L.Ed. 513 (1949) (the First Amendment permits regulation of the time, place, and manner of the use of sound trucks). However, the Amendment is not a "regulation." Rather, it is a *general prohibition* of the use of non-English languages by all state personnel during the performance of government business and by all persons seeking to interact with all levels of government in Arizona. The Amendment's goal to promote English as a common language does not require a general prohibition on non-English usage. English can be promoted without prohibiting the use of other languages by state and local governments. Therefore, the Amendment does not meet the compelling state interest test and thus does not survive First Amendment strict scrutiny analysis.

¶ 66 Finally, we note that any interference with First Amendment rights need not be an absolute bar to render it unconstitutional as violating equal protection; a substantial burden upon that right is sufficient to warrant constitutional protections. By permanently implementing a linguistic barrier between persons and the government they have a right to petition, the Amendment substantially burdens First Amendment rights. *See Eastern R.R. Presidents Conference,* 365 U.S. at 137, 81 S.Ct. at 529 ("The

---

**13.** We recognize that in *Yniguez v. AOE* the Ninth Circuit relied upon *Meyer* in concluding that the Amendment violated the First Amendment. 69 F.3d at 945–48 (citing *Meyer,* 262 U.S. at 403, 43 S.Ct. at 626). We note, however, that *Meyer* was decided two years before the Court applied the First Amendment to the states through the Fourteenth Amendment. *Gitlow,* 268 U.S. 652, 45 S.Ct. 625. While we hold that

the Amendment violates the First Amendment, we rely on the decisions previously discussed and we do not reach the issue of whether *Meyer* offers speech any particular protection under the First Amendment. *See* Howard O. Hunter, *Problems in Search of Principles: The First Amendment in the Supreme Court from 1791–1930,* 35 Emory L.J. 59, 117, 128 (1986) (stating that *Meyer* does not offer speech any particular protection).

whole concept of representation depends upon the ability of the people to make their wishes known to their representatives"). Therefore, the Amendment violates the Fourteenth Amendment's guarantees of equal protection because it impinges upon both the fundamental right to participate equally in the political process and the right to petition the government for redress.

## VII. Severability

¶ 67 In an effort to salvage the Amendment, the Attorney General urges us to hold that only Sections 1(2) and 3(1)(a) are unconstitutional and to sever the remaining portions. In Arizona, an entire statute (in this case, a constitutional provision) need not be declared unconstitutional if constitutional portions can be separated. *Republic Inv. Fund I v. Town of Surprise,* 166 Ariz. 143, 151, 800 P.2d 1251, 1259 (1990). However, the valid portion of the statute will be severed only if it can be determined from the language that the voters would have enacted the valid portion absent the invalid portion. *State Compensation Fund v. Symington,* 174 Ariz. 188, 195, 848 P.2d 273, 280 (1993). We hold that the Amendment is not capable of such judicial surgery, and we decline to sever the invalid portions of the Amendment. We do so, first, because the Amendment does not contain a severability clause and, second, because the record is devoid of evidence that the voters would have enacted such a rewritten and essentially meaningless amendment. *See Campana v. Arizona State Land Dep't,* 176 Ariz. 288, 294, 860 P.2d 1341, 1347 (1993) ("A statute or provision is severable if the valid and invalid portions are not so intimately connected as to raise the presumption that the legislature would not have enacted the one without the other and if the invalid portion was not the inducement for the passage of the entire act") (citations omitted).

¶ 68 It is not possible to sanitize the Amendment in order to narrow it sufficiently to support its constitutionality. We have no way of knowing, aside from mere speculation, whether the people would have passed the two sections that declare English as the official language and require that all acts of government be conducted in English. More-

over, even if those two provisions alone had been passed, it would be an unjustified stretch to insert the word "official" before the word "act" as the Attorney General now proposes. Therefore, we hold that the Amendment does not lend itself to severability.

## CONCLUSION

¶ 69 The Attorney General's attempt to narrow the construction and application of the Amendment is irreconcilable with both the Amendment's plain language and its legislative history. Thus, that construction cannot be used to obviate the Amendment's unconstitutionality or to cure its overbreadth. The Amendment is not content-neutral; rather, it constitutes a sweeping injunction against speech in any language other than English. The Amendment unconstitutionally infringes upon multiple First Amendment interests—those of the public, of public employees, and of elected officials.

¶ 70 The Amendment adversely affects non-English speaking persons and impinges on their ability to seek and obtain information and services from government. Because the Amendment chills First Amendment rights that government is not otherwise entitled to proscribe, it violates the Equal Protection Clause of the Fourteenth Amendment. The Amendment's constitutional infirmity cannot be salvaged by invoking the doctrine of severability.

¶ 71 We expressly note that we do not undertake to define the constitutional parameters of officially *promoting* English, as distinguished from banning non-English speech. Our holding does not question or denigrate efforts to encourage English as a common language; but such efforts must not run afoul of constitutional requirements and individual liberties. Nor is the constitutionality of a less comprehensive English-only provision before us.

¶ 72 Significantly, in finding the Amendment unconstitutional, we do not hold, or even suggest, that any governmental entity in Arizona has a constitutional obligation to provide services in languages other than En-

glish, except, of course, to the extent required by federal law.

¶ 73 The opinion of the court of appeals is vacated and the trial court's judgment is reversed. This matter is remanded with directions to enter judgment in accordance with this opinion.

ZLAKET, C.J., and JONES, V.C.J., and FELDMAN, J., concur.

MARTONE, Justice, specially concurring.

¶ 74 A word of caution is in order. The posture of this case is unusual. The plaintiffs here have never faced actual or threatened injury because the defendants take the position that the English Only Amendment is narrow and applies only to official acts. Not content with this narrowing construction, the plaintiffs have taken the position that the Amendment is not limited to official acts and is broad enough to include even legislator-constituent communications. The defendants, however, do not raise a standing or case or controversy defense, and we are left to wonder about its proper resolution.

¶ 75 There is yet a second layer of potential case or controversy question in this case. The defendants concede that if the Amendment is interpreted as broadly as suggested by plaintiffs, then it is unconstitutional. And yet the plaintiffs take the position that if the Amendment is as narrow as the defendants say it is (i.e., applies only to official acts), then it is not unconstitutional. This leaves us with plaintiffs arguing that it is unconstitutional because of its breadth, but no one arguing that it is constitutional notwithstanding its breadth. We thus have no adversariness in connection with the ultimate federal constitutional question. *Cf.* U.S. Const. art. III, § 2 (requiring the existence of a "case" or "controversy" for federal adjudication); *see, e.g., Arizonans For Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 1067–69, 1075, 137 L.Ed.2d 170 (1997) (remanding case for dismissal for lack of case or controversy). To illustrate, the en banc opinion of the United States Court of Appeals for the Ninth Circuit in *Yniguez v. Arizonans for Official English,* 69 F.3d 920 (9th Cir.1995), was decided by a 6–5 vote, but the conten-

tions of the five dissenting judges in the court of appeals have not been made in this court because the defendants agree with the plaintiffs that if the Amendment is broadly construed, it is unconstitutional.

¶ 76 It is likely, therefore, that were we an Article III court, we would have had to dismiss this case for lack of case or controversy. We are not unaware of a disquieting paradox: because of the lack of adversity, there is a greater risk of error—yet that same lack of adversity diminishes the likelihood of further judicial review.

### APPENDIX

Article XXVIII of the Arizona Constitution provides as follows:

### ARTICLE XXVIII. ENGLISH AS THE OFFICIAL LANGUAGE

### § 1. English as the official language; applicability

Section 1. (1) The English language is the official language of the State of Arizona.

(2) As the official language of this State, the English language is the language of the ballot, the public schools and all government functions and actions.

(3) (a) This Article applies to:

(i) the legislative, executive and judicial branches of government

(ii) all political subdivisions, departments, agencies, organizations, and instrumentalities of this State, including local governments and municipalities,

(iii) all statutes, ordinances, rules, orders, programs and policies.

(iv) all government officials and employees during the performance of government business.

(b) As used in this Article, the phrase, "This State and all political subdivisions of this State" shall include every entity, person, action or item described in this Section, as appropriate to the circumstances.

## § 2. Requiring this state to preserve, protect and enhance English

Section 2. This State and all political subdivisions of this State shall take all reasonable steps to preserve, protect and enhance the role of the English language as the official language of the State of Arizona.

## § 3. Prohibiting this state from using or requiring the use of languages other than English; exceptions

Section 3. (1) Except as provided in Subsection (2):

(a) This State and all political subdivisions of this State shall act in English and in no other language.

(b) No entity to which this Article applies shall make or enforce a law, order, decree or policy which requires the use of a language other than English.

(c) No governmental document shall be valid, effective or enforceable unless it is in the English language.

(2) This State and all political subdivisions of this State may act in a language other than English under any of the following circumstances:

(a) to assist students who are not proficient in the English language, to the extent necessary to comply with federal law, by giving educational instruction in a language other than English to provide as rapid as possible a transition to English.

(b) to comply with other federal laws.

(c) to teach a student a foreign language as part of a required or voluntary educational curriculum.

(d) to protect public health or safety.

(e) to protect the rights of criminal defendants or victims of crime.

## § 4. Enforcement; standing

Section 4. A person who resides in or does business in this State shall have standing to bring suit to enforce this Article in a court of record of the State. The Legislature may enact reasonable limitations on the time and manner of bringing suit under this subsection.